229 F.3d 435 (3rd Cir. 2000)
 PI LAMBDA PHI FRATERNITY, INC., A CORPORATION WITH ITS PRINCIPAL PLACE OF BUSINESS IN CONNECTICUT; PA GAMMA SIGMA CHAPTER OF PI LAMBDA PHI FRATERNITY, AN UNINCORPORATED ASSOCIATION OF INDIVIDUALS; PA GAMMA SIGMA ALUMNI CHAPTER OF PI LAMBDA PHI FRATERNITY; BRAD ZULICK; CHAD CRISP; JOSHUA LANG, INDIVIDUALS, WHO ARE MEMBERS OF THE PA GAMMA SIGMA CHAPTER OF PI LAMBDA PHI FRATERNITY; KEVIN ARMOUR; JON MILLER, INDIVIDUALS WHO DESIRE TO JOIN PI LAMBDA PHI FRATERNITY, APPELLANTS
V.
UNIVERSITY OF PITTSBURGH; MARK NORDENBERG, INDIVIDUALLY AND IN HIS CAPACITY AS THE CHANCELLOR OF THE UNIVERSITY OF PITTSBURGH; ROBERT GALLAGHER, INDIVIDUALLY AND IN HIS CAPACITY AS THE INTERIM VICE- CHANCELLOR FOR STUDENT AFFAIRS OF THE UNIVERSITY OF PITTSBURGH; DENNIS DONHAM, INDIVIDUALLY AND IN HIS CAPACITY AS ASSISTANT VICE-CHANCELLOR FOR STUDENT AFFAIRS OF THE UNIVERSITY OF PITTSBURGH; LEON HALEY, FORMER VICE- CHANCELLOR FOR STUDENT AFFAIRS OF THE UNIVERSITY OF PITTSBURGH; DAN COHEN, INDIVIDUALLY AND IN HIS CAPACITY AS A PITTSBURGH CITY COUNCIL MEMBER; CITY OF PITTSBURGH; ELOISE HIRSH, INDIVIDUALLY AND IN HER CAPACITY AS DIRECTOR OF PLANNING OF THE CITY OF PITTSBURGH
 No. 99-3685
 U.S. Court of Appeals, Third Circuit
 Argued: June 28, 2000
Filed October 25, 2000
 
 On Appeal From the United States District Court For the Western District of Pennsylvania (D.C. Civ. No. 97-cv-00703) District Judge: Honorable Donald E. Ziegler[Copyrighted Material Omitted]
 Edward A. Olds, Esquire (argued) 1007 Mount Royal Boulevard Pittsburgh, PA 15223 Counsel for Appellants
 Susan L. Wormer, Esquire (argued) Mark Nordenberg, Esquire Robert Gallagher, Esquire Dennis Donham, Esquire Leon Haley, Esquire University of Pittsburgh Office of General Counsel 3200 Cathedral of Learning Pittsburgh, PA 15260 Counsel for Appellees
 John J. Barrett, Jr., Esquire Saul, Ewing, Remick & Saul, Llp Centre Square West 1500 Market Street, 38th Floor Philadelphia, PA 19102-2186 Counsel for Amicus Curiae North- American Interfraternity ConferenceBefore: Becker, Chief Judge, Sloviter, and Rosenn, Circuit Judges.
 OPINION OF THE COURT
 Becker, Chief Judge.
 
 
 1
 The University of Pittsburgh chapter of the Pi Lambda Phi fraternity (the Chapter), believing that its members' constitutional rights of freedom of association were violated by disciplinary action taken against it by the University of Pittsburgh (the University), brought suit in the District Court against the University, the City of Pittsburgh, and various individual defendants. The disciplinary action in question occurred when the University stripped the Chapter of its status as a recognized student organization after several of its members were arrested in a drug raid at the Chapter's fraternity house. The Chapter's international parent organization and several current and prospective Chapter members joined the Chapter as plaintiffs.
 
 
 2
 Two types of association are protected by the federal Constitution: intimate association (i.e., certain close and intimate human relationships like family relationships) and expressive association (i.e., association for the purpose of engaging in activities protected by the First Amendment). See Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984). The Chapter argues that it is a constitutionally protected group because its members engage in intimate association or expressive association (or both), and asserts that its members' associational rights were improperly infringed by the University's action.
 
 
 3
 This is an appeal from an order of the District Court granting summary judgment in favor of the University and its co-defendants. We hold that the Chapter does not possess rights of intimate association as the Supreme Court explicated that concept in Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537 (1987) and Roberts. The Chapter's size, membership criteria, and openness to the public all militate against its claim that it engages in intimate association. We also hold, following the Supreme Court's analysis in Boy Scouts of America v. Dale, 120 S. Ct. 2446 (2000), City of Dallas v. Stanglin, 490 U.S. 19 (1989), Duarte, and Roberts, that the Chapter does not engage in constitutionally protected expressive association. While the Court has not set a very high bar for expressive association, the Chapter has failed to make a showing in the record that it meets even this standard.
 
 
 4
 Furthermore, even if the Chapter does exercise rights of protected expressive association, we conclude that the effect of the University's action here did not have a close enough relationship to the Chapter's expressive activities to rise to the level of a constitutional violation. In its freedom of expression jurisprudence, the Supreme Court has required a close relationship between the state action and the affected expressive activity to find a constitutional violation. In Dale, Duarte, and Roberts, because the state action directly affected the groups' associational activities, the Court held that the state had to show a compelling interest that justified the level of the burden imposed on the groups' expression. See Dale, 120 S. Ct. at 2456-57; Duarte, 481 U.S. at 549; Roberts, 468 U.S. at 623. In United States v. O'Brien, 391 U.S. 367 (1968), the Court applied a less stringent, medium scrutiny test to state action that had an incidental effect on the right to free expression. See id. at 376-77. But neither the compelling interest nor the O'Brien tests apply in the instant case, because the University's action had merely an indirect and attenuated effect on the Chapter's expressive activities. Because almost any government sanction could be characterized as having some indirect effect on First Amendment activities, see Arcara v. Cloud Books, Inc., 478 U.S. 697, 706 (1986), indirect and attenuated effects on expression do not rise to the level of a constitutional violation.
 
 
 5
 For these reasons, we will affirm the District Court's grant of summary judgment, albeit on somewhat different grounds than those used by the District Court.[1]
 
 I. Facts
 
 6
 Pi Lambda Phi is an international fraternity with a longstanding local chapter at the University of Pittsburgh. On April 30, 1996, at the beginning of the University's summer recess, the Pittsburgh police raided the house at 225 North Dithridge Street, which is owned by the Chapter and serves as the home of several Chapter members. During the raid, the police found various drugs and drug paraphernalia, including heroin, cocaine, opium, and Rohypnol (the "date rape" drug). Four Chapter members were arrested and charged with possession of controlled substances. One of the arrested Chapter members was the "Risk Manager" for Pi Lambda Phi, and a second was the president of the University's Interfraternity Council (a student organization composed of representatives from University fraternities). Another of these four was charged with and convicted of possession and distribution of controlled substances, and was expelled from the University.
 
 
 7
 On May 2, 1996, the University suspended the Chapter pending an investigation into the matter. The University subsequently held a hearing on whether the Chapter should be punished. While the University's investigating panel found that there was "no direct relationship between the drug raid and the [C]hapter itself," and no evidence that the absent members were involved in, tacitly approved of, or were even aware of the drug activity, the panel did find the Chapter "guilty of a lack of responsibility for its members for the events that occurred at their house on the above date." The panel recommended three years probation.[2] [Id.]
 
 
 8
 The Vice Chancellor of student affairs, Dennis Donham (one of the individual defendants in this action), reviewed the panel's decision and concluded that the Chapter was responsible for the drug activity in its house under Section II.1 of the University Compilation of Codes Governing Fraternity and Sorority Activity, which states that "[c]hapters shall be held accountable for actions of individual members and their guests." Donham decided that, instead of probation, the University should revoke the Chapter's status as a "recognized student organization" for one year. Donham also established several restrictions on the Chapter's activities, including a prohibition on participation in University-sponsored Greek activities and a prohibition on recruitment of new members through the University "Rush" process. Donham issued a letter to the Chapter on July 9, 1996, detailing this decision; the letter also stated that the Chapter could reapply to be a recognized student organization on April 30, 1997, although it would have to conform to all the regulations and restrictions placed upon it and subject itself to close scrutiny by the University.
 
 
 9
 The Chapter appealed Donham's decision to Leon Haley, the Vice Chancellor for Student and Public Affairs. After a hearing, Haley upheld the sanctions. The Chapter then appealed to Haley's successor, Robert Gallagher, the interim Vice Chancellor for Student and Public Affairs, and Gallagher upheld Haley's decision. Both Haley and Gallagher are named as defendants.
 
 
 10
 In late November 1996, a University Student Affairs hearing panel reviewed the Chapter's status and concluded that it had complied with many of the key requirements set forth in Donham's July 9th letter. The panel recommended to Gallagher that the Chapter be recertified as a recognized student organization on probationary status. Earlier that month, however, the University's Interfraternity Council had voted to recommend to Gallagher that he not grant recognized student group status to the Chapter at that time. Also around this time, Dan Cohen, a member of the Pittsburgh city council, wrote a letter to Gallagher expressing concerns regarding the possible recertification of the Chapter. Cohen stated in his letter that the Chapter had "created a nuisance to the [North Dithridge Street] neighborhood for years with loud parties, vandalism, public urination, and litter," and he urged Gallagher not to recertify the Chapter.
 
 
 11
 On December 4, 1996, Gallagher decided to continue the Chapter's non-recognized status, as he felt that another term was needed for a full appraisal of the Chapter. He stated in a deposition that he was influenced by: (1) the seriousness of the drug offense; (2) the fact that the Interfraternity council, a peer group of the Chapter, had voted against recognizing the Chapter; (3) the fact that the Chapter had yet to bring into the house a Graduate Resident Advisor, which Gallagher considered to be a key required condition in Donham's July 9th letter; and (4) concern for other University students and for members of the community who lived near the Chapter house.
 
 
 12
 On February 27, 1997, the Student Affairs panel held a second hearing on whether the University should restore the Chapter's status as a recognized student organization, and again it recommended that the University should do so as of April 29, 1997. The panel concluded that the Chapter had continued to make progress in addressing its earlier problems by bringing in a Graduate Resident Advisor (who had written the University's Office of Student Affairs with a positive review), by expelling unruly members, and by raising its average GPA up to the highest of any fraternity on campus. On April 18, 1997, before the University ruled on this Student Affairs panel recommendation, the Chapter filed this lawsuit. On May 15, 1997, the University again decided not to recertify the Chapter as a recognized organization. Gallagher based this decision on then recently-disclosed information that the Chapter's Risk Manager had been arrested in the drug raid and that drugs had been purchased in the house several days before the raid, thus supporting the inference that Chapter members had openly possessed and used drugs in the house during the academic year. Gallagher's letter to the Chapter announcing this decision stated that the University would entertain further petitions by the Chapter for recertification beginning May 15, 1998. Even though counsel for the University stated at oral argument (on June 28, 2000) that she knew of nothing that would prevent the University from recertifying the Chapter, the Chapter had not submitted any further petitions or requests for recertification to the University up to that time.
 
 II. Procedural History
 
 13
 This civil action, brought under 42 U.S.C. S 1983, alleged violations of the Chapter members' rights of association under the First Amendment, as well as violations of their Equal Protection and Due Process rights under the Fourteenth Amendment. The University meets the state actor requirement for defendants in S 1983 actions. See Krynicky v. University of Pittsburgh, 742 F.2d 94, 99 (3d Cir. 1984) (holding that "the actions of the University [of Pittsburgh] are actions taken under color of state law for purposes of section 1983"). The Chapter voluntarily dismissed the Due Process claims as well as all claims against the city defendants. After some discovery and testimony at fact-finding hearings, the University defendants' motion for summary judgment was granted by the District Court.
 
 
 14
 The District Court concluded that the Chapter was primarily engaged in social activities rather than in expressive or intimate association, and that its associational activities were therefore not protected by the First Amendment. The Court held further that even if the Chapter's associational activities were protected by the First Amendment, the government interest underlying the University's action merited whatever associational abridgements did occur. This timely appeal followed. The District Court had jurisdiction under 28 U.S.C. S 1331, and we have jurisdiction under 28 U.S.C. S 1291. We set forth the familiar standard of review of grants of summary judgment in the margin.[3]
 
 
 15
 III. The Chapter's Freedom of Association Claims
 
 
 16
 The Supreme Court has held that there are two kinds of freedom of association that are constitutionally protected: intimate association and expressive association. The Court summarized these two forms of associational freedom in Roberts v. United States Jaycees, 468 U.S. 609 (1984):
 
 
 17
 In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.
 
 
 18
 Id. at 617-18. The Chapter contends that both kind of associational rights are implicated in this case. The Supreme Court has held that these two rights may coincide in a particular group's association. See id. at 618. We follow the Court's lead in considering each of the associational rights separately.
 
 A. The Right of Intimate Association
 
 19
 The right of intimate association involves an individual's right to enter into and maintain intimate or private relationships free of state intrusion. The types of relationships that give rise to this right may take various forms, but the Supreme Court has held that these relationships must be "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." See id. at 620. Family relationships are the paradigmatic form of protected intimate associations, as they "by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." See id. at 619- 20. In determining the nature of a given relationship, relevant factors to consider include a group's "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." See id. at 620.
 
 
 20
 Applying these precepts to the case at hand, we conclude that the Chapter is not the type of association that warrants constitutional protection as an intimate association. In both Roberts and Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537 (1987), the Court found that the Jaycees and the Rotary Club were not protected intimate associations because, inter alia, the local clubs were not small in size (ranging from fewer than 20 to 900 members), they actively recruited members from the public, they were not sufficiently selective in their admission policies, and the clubs performed many of their activities in public or invited members of the public to attend. See Duarte, 481 U.S. at 546-47; Roberts, 468 U.S. at 621.
 
 
 21
 Similarly, the University chapter of Pi Lambda Phi is not a particularly small association. While the number of students in the Chapter was reduced to 22 after certain members had been expelled and the University had prohibited the Chapter from recruiting new members for a year, the chapter had inducted 20 new members during the fall of 1995, before the drug raid. Extrapolating over four years, the Chapter, when recruiting and existing normally, would have approximately 80 members at any one time. At all events, a range of 20 to 80 members would put the Chapter within the same size range as the local Rotary Clubs that the Court held did not engage in intimate association in Duarte, 481 U.S. at 546.
 
 
 22
 Furthermore, the Chapter actively recruits new members from the University population at large and it is not particularly selective in whom it admits. The international organization of Pi Lambda Phi strongly encourages its chapters to recruit new members aggressively so as to continue the growth of the organization. The Chapter also invites members of the public into its house for social activities and participates in many public University events. All of these elements--the Chapter's size, lack of selectivity, and lack of seclusion in its activities--support our conclusion that the Chapter lacks the essential characteristics of constitutionally protected intimate association. We thus find the claim that the Chapter and its members enjoy a constitutional right to intimate association to be without merit.
 
 B. The Right of Expressive Association
 
 23
 In Boy Scouts of America v. Dale, 120 S. Ct. 2446 (2000), the Supreme Court used a three-step process to analyze the Boy Scouts' expressive association claim, which roughly follows the analytical structure that the Court employed in Roberts and Duarte to examine such claims. See Roberts, 468 U.S. at 622-23; Duarte, 481 U.S. at 548-49. First, the Court considered whether the group making the claim engaged in expressive association. See Dale, 120 S. Ct. at 2451. The Court then analyzed whether the state action at issue significantly affected the group's ability to advocate its viewpoints. See id. at 2452. Finally, it weighed the state's interest implicated in its action against the burden imposed on the associational expression to determine if the state interest justified the burden. See id. at 2456.
 
 
 24
 In the case before us, the District Court ended its analysis at step one, concluding that the Chapter was not a constitutionally protected expressive association because it was essentially a social organization. The analysis required at this step is slightly more complicated, however, as social organizations may receive constitutional associational protection in certain cases. The Supreme Court has recognized a First Amendment "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts, 468 U.S. at 622 (emphasis added). Thus,"[t]he First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." Dale, 120 S. Ct. at 2451. We must therefore engage in a more detailed examination of the Chapter and its expressive characteristics.
 
 
 25
 1. The Chapter's Allegedly Expressive Character
 
 
 26
 The Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity. In Roberts, the Court considered whether the Jaycees engaged in expressive association. It noted that the Jaycees was a national organization with local chapters throughout the country. The purpose of the Jaycees was to develop "a spirit of genuine Americanism and civic interest" in its members, Roberts, 468 U.S. at 612-13 (quoting the Jaycees' bylaws), and the organization made available to its members various programs, products, and activities toward this end. See id. at 613-14. While there was a strong social component to the Jaycees (e.g., its bylaws included the goal of developing friendship among young men, see id. at 613), the Court found the right to expressive association "plainly implicated" by the "various protected activities in which the Jaycees engages." Id. at 622. The "various protected activities" were summarized in Roberts as follows:
 
 
 27
 [A] not insubstantial part of the Jaycees' activities constitutes protected expression on political, economic, cultural, and social affairs. Over the years, the national and local levels of the organization have taken public positions on a number of diverse issues, and members of the Jaycees regularly engage in a variety of civic, charitable, lobbying, fundraising, and other activities.
 
 
 28
 Id. at 626-27 (citations omitted).
 
 
 29
 In Dale, the Supreme Court was very succinct in addressing the associational nature of the Boy Scouts of America. The Court first held that it was "indisputable" that the Boy Scouts engaged in expressive association, given that the group's general mission is " `[t]o instill values in young people.' " Dale, 120 S. Ct. at 2452 (quoting the Boy Scouts' mission statement). The Court then quoted Justice O'Connor's quite expansive definition of expressive association contained in her Roberts concurrence: " `Even the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement.' " Id. (quoting Roberts, 468 U.S. at 636 (O'Connor, J., concurring)).
 
 
 30
 The expansive notions of expressive association used in Roberts and Dale demonstrate that there is no requirement that an organization be primarily political (or even primarily expressive) in order to receive constitutional protection for expressive associational activity. The Court has made it clear, however, that there is a de minimis threshold for expressive activity claims. In City of Dallas v. Stanglin, 490 U.S. 19 (1989), the plaintiffs claimed that they had an expressive associational interest in mingling at a dance hall. The Supreme Court firmly rejected this claim, holding that, although the patrons were associating with one another, they were not engaging in First Amendment- protected expression while doing so. "There is no suggestion that these patrons `take positions on public questions' or perform any of the other similar activities described in Board of Directors of Rotary International v. Rotary Club of Duarte." Id. at 25.[4] The Court thus held that protected expression does not include any possible expression. See id. ("It is possible to find some kernel of expression in almost every activity a person undertakes--for example, walking down the street or meeting one's friends at a shopping mall--but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.")
 
 
 31
 The record does not support the Chapter's claim that its level of expression rises to the de minimis standard required by Stanglin, Roberts, and Dale for constitutionally protected expressive association. Nothing in the record indicates that the Chapter ever took a public stance on any issue of public political, social, or cultural importance. The Chapter argues that it engages in expressive activity through its charity work and by promoting the ideals embraced by its parent organization. The specific facts that the Chapter offers in the record to support this claim, however, fall far short of sustaining the assertion that it engages in a level of expressive association that is sufficient for constitutional protection.
 
 
 32
 While the international organization of Pi Lambda Phi has an admirable history that includes being the country's first non-sectarian fraternity, there is no substantial evidence in the record that the University chapter of Pi Lambda has done anything to actively pursue the ideals underlying this stance. Although members of the Chapter claimed in their deposition testimony that the Chapter still promotes these ideals, they did not give any specific examples of how it does so. Furthermore, while Pi Lambda Phi's international organization runs various programs aimed at individual development, there is no evidence in the record that even a single member of the University chapter participated in any of these programs.
 
 
 33
 The Chapter also points to a couple of relatively minor acts of charity performed in 1996 as proof of its expressive aspects, but these are underwhelming. The Chapter represents that it once helped run a Halloween haunted house for the Pittsburgh School for the Blind, raised $350 through selling raffle tickets for a charity called the Genesis House, and ran a "Breakfast with Santa" to raise money for Genesis House. [74-75a] The Chapter's counsel admitted at oral argument that this was the extent of the Chapter's charitable activities. A few minor charitable acts do not alone make a group's association expressive, and community service must have more than a merely incidental relationship to the group's character for such service to implicate the constitutional protection of expressive association. The Chapter has not shown in the record that its sporadic acts of community service are related to its basic nature or goals.
 
 
 34
 In sum, an organization must do more than simply claim to be an expressive association in order to receive the benefits of constitutional protection. The Chapter's contentions along these lines, along with its meager showing of a few minor acts of community service, are insufficient to meet the minimum requirements for an expressive association. Therefore, the Chapter's claim of infringement of its right to expressive association fails. We add that we are not holding that fraternities per se do not engage in constitutionally protected expressive association. It is entirely possible that a fraternity (or sorority, or similar group) could make out a successful expressive association claim under the rules laid out in Stanglin, Roberts, and Dale. We hold only that the University chapter of Pi Lambda Phi has failed to make out such a claim on the record before us.
 
 
 35
 2. The Chapter's Claim of Infringement of Its Expressive Rights
 
 
 36
 Even if the Chapter had survived the first step of the Dale expressive association analysis by making a sufficient showing that it engages in constitutionally protected expressive association, its claim that this right has been infringed would still fail. The second step in the Dale analysis involves determining whether the state action at issue significantly affected the group's ability to advocate its viewpoints. The Chapter's argument at this stage relies heavily on Healy v. James, 408 U.S. 169 (1972), where the Supreme Court considered the expressive associational rights claim of a group of students whose petition to have their newly formed chapter of Students for a Democratic Society (SDS) recognized as a campus student group was rejected by Central Connecticut State College (CCSC). The Court concluded that, because the college had a general policy of allowing students to form groups, the selective refusal to allow SDS to become an official group on the basis of its philosophical position would be an unconstitutional abridgment of the right of expressive association. The Court held that "denial of official recognition, without justification, to college organizations burdens or abridges that associational right." Id. at 181.
 
 
 37
 The Chapter argues that its situation is closely analogous to the SDS group in Healy. It contends that the practical effect of the University's withdrawal of its recognition of the Chapter is even more severe than CCSC's denial of recognition was for the SDS in Healy, because the Chapter cannot now participate in University-sponsored Rush activities, rendering it difficult, if not impossible, to recruit new members. As a non-recognized organization, the Chapter submits, its chapter will vanish altogether.
 
 
 38
 Whether or not it is true that the Chapter is in danger of disappearing--and we are by no means persuaded that the record supports this allegation--Healy does not dictate the result suggested by the Chapter. In fact, Healy specifically contemplated a situation such as the one before us, where a university acts out of non-ideological motives to directly restrict a group's non-expressive activity, even when those actions would have an indirect effect on expressive activity. The Court noted in Healy that if the reason for denying the SDS recognized status was grounded in reasonable concerns about management of violence, the denial could be upheld: "Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." Id. at 189.
 
 
 39
 Furthermore, the Court stated in Healy that a university has the power to withdraw recognition if an organization breaks university rules: "[A college administration] may also impose sanctions on those who violate the rules. We find, for instance, that the Student Affairs Committee's admonition to petitioners in this case suggests one permissible practice--recognition, once accorded, may be withdrawn or suspended if petitioners fail to respect campus law." Id. at 194 n.24. In the case at bar, there is no doubt that the Chapter violated University rules, and Healy clearly contemplates the University's power to withdraw recognition from the Chapter without a constitutional violation of associational rights.
 
 
 40
 The Supreme Court's post-Healy free expression jurisprudence also supports our conclusion. The Court has applied three different levels of scrutiny to state burdens on expression, depending on the character of the relationship between the state action and the protected expression. The most rigorous standard of review is triggered when the state action directly burdens expressive rights. Roberts, Duarte, and Dale all involved this kind of direct effect; in each of these cases, a state law mandated that the group accept members with whom the group did not want to associate. The Court recognized this as a direct burden on the associational expressive rights of the respective groups, because the state action directly affected the groups' associational abilities. The Court thus required the state to show a compelling interest that justified the level of the burden imposed on the groups' expression. See Dale, 120 S. Ct. at 2456-57; Duarte, 481 U.S. at 549; Roberts, 468 U.S. at 623.
 
 
 41
 U.S. v. O'Brien, 391 U.S. 367 (1968) established an intermediate scrutiny test for regulations that have an "incidental" effect on expression. The state action at issue in O'Brien consisted of a federal law that criminalized the burning of draft cards. O'Brien burned his draft card to communicate an anti-war political message and was prosecuted under the federal law. In his defense, O'Brien argued that the law infringed his First Amendment expressive rights. The Supreme Court noted that the regulation did not abridge free speech on its face, as "there is nothing necessarily expressive" about the prohibited conduct. Id. at 375. But the Court also recognized that the prohibited conduct could be used to communicate a political message and held that, when "speech" and "nonspeech" elements are combined in the same course of conduct, a regulation of the "nonspeech" element is an incidental restriction on the "speech" element, and thus must meet an intermediate four-part test. See id. at 376- 377; see also Dale, 120 S. Ct. at 2456-57 (declining to apply the intermediate standard of review from O'Brien to the regulation at issue because the O'Brien test applies to regulations that have an "incidental effect" on protected speech, but the regulation as applied to the Boy Scouts "directly and immediately affects associational rights").
 
 
 42
 Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986), sets out the appropriate structure for analyzing a state action that neither directly regulates protected expression nor has an "incidental effect" on such expression. In Arcara, the state closed down a bookstore because prostitution was occurring on the premises in violation of state law. The owners of the book store claimed that this state action violated their First Amendment right to sell books. The Court rejected this claim because the state action regulated constitutionally unprotected conduct that did not itself contain or manifest protected expression, and thus the action did not merit even the intermediate scrutiny of the O'Brien analysis. See Arcara, 478 U.S. at 704-05. Since the protected expression was only indirectly affected by the state action (via the sanction imposed on unprotected conduct), the Court held that no First Amendment violation had occurred, because "[a]ny other conclusion would lead to the absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment." Id. at 708 (O'Connor, J., concurring).
 
 
 43
 In the case at bar, the state action had neither a direct nor even an incidental effect on the Chapter's protected associational rights. Unlike in Dale, the University's action does not require the Chapter to associate with anyone, nor is the regulation directed on its face at the Chapter's expressive or associational activities. Unlike in O'Brien, the University's regulation did not sanction conduct that had both speech and nonspeech elements; the regulation was applied simply to the Chapter's drug activity. The Chapter makes no claim that its members engaged in drug activity in order to communicate a political message, nor does it claim that there is any direct connection between its members' drug activity and their First Amendment expression. Therefore, the University's action neither directly nor incidentally affected the Chapter's expressive interests.
 
 
 44
 The University's withdrawal of recognition of the Chapter because of its drug activities thus fits neatly under an Arcara analysis. Like the bookstore, the Chapter members' expressive rights were inhibited by a state sanction of activities that themselves had no protected expressive element, and were entirely unrelated to the Chapter members' expressive activities.[5] Therefore, the effect of the state action on the expressive rights was indirect, and there is thus no constitutionally impermissible infringement on the Chapter's right of expressive association.[6]
 
 
 45
 The judgment of the District Court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Chapter also brought an Equal Protection claim, but we reject this claim for the reasons stated below in note 6.
 
 
 [2]
 It appears from the record that, at the time of this panel's decision, the University was not aware that the Chapter's Risk Manager was one of the Chapter members arrested, nor did it know that drugs had been purchased in the Chapter's house several days before the raid. The University's Interim Vice Chancellor Robert Gallagher later concluded on the basis of this subsequently revealed information that the other Chapter members must have been aware of the drug activity. See infra at 440.
 
 
 [3]
 We exercise plenary review over a District Court's grant of summary judgment and review the facts in the light most favorable to the party against whom summary judgment was entered. See Coolspring Stone Supply, Inc. v. American States Life Ins. Co., 10 F.3d 144, 146 (3d Cir. 1993). Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See F.R.C.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
 
 
 [4]
 The "other similar activities" referred to in the above quote from Stanglin include engaging in "a variety of commendable service activities" and "humanitarian service [and] high ethical standards in all vocations." Duarte, 481 U.S. at 548.
 
 
 [5]
 The Chapter also submits that the University's action is unconstitutional because it infringes on the associational rights of all of the Chapter's members in order to punish the drug activity of only a few. This argument fails because the Supreme Court has long recognized that, in a school context, the government has great latitude to keep reasonable order through its regulations, and the University has reasonable grounds for concluding that the Chapter's general atmosphere is conducive to disruptive and illegal activity. "Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." Healy v. James, 408 U.S. 169, 189 (1972); see also Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506, 513 (1969) (holding that the "special characteristics of the school environment" allow a state-run school to prohibit actions that "materially and substantially disrupt the work and discipline of the school").
 
 
 [6]
 The Chapter also alleges that the University treats fraternities and sororities differently from other student organizations in violation of the Equal Protection Clause of the Fourteenth Amendment, which, of course, provides that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S Const. amend. XIV, S 1. The Chapter argues that it was treated differently insofar as it was held accountable as an organization for the individual actions of its members when other students and student organizations are not held similarly accountable. This claim fails for two reasons. First, as the District Court noted, there is ample evidence in the record that the University's rules on the vicarious accountability of fraternities and sororities for their members' conduct is effectively the same as its rules on the vicarious accountability of all University students for guests and visitors in their rooms, which are set forth in the University's Student Code of Conduct and Judicial Procedures. Because there is no substantial difference between the way the University holds fraternities and individual students accountable, the Chapter has failed to show that an equal protection issue even arises here.
 Second, the Chapter's claim would fail even if it had shown that the University treats fraternities differently from other students. "Unless laws create suspect classifications or impinge upon constitutionally protected rights, it need only be shown that they bear some rational relationship to a legitimate state purpose." Dallas v. Stanglin, 490 U.S. 19, 23 (1989) (citations and internal quotations omitted). Because fraternity membership is not a suspect classification, and because there is no fundamental right at issue here (since the Chapter's expressive association claim fails), any different treatment of the Chapter by the University should be reviewed under the rational basis test. The District Court found that the University had a rational basis for treating fraternities differently from other students and groups, and we have no reason to question that finding. Fraternities and sororities are the only University student organizations that maintain their own off-campus housing for students, so it is clearly rational for the University to subject them to certain rules that do not apply to other student organizations.