05-3716-cv
Piscottano v. Murphy

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2005

(Argued: February 14, 2006      Decided: December 21, 2007)


Docket No. 05-3716-cv

_____

GARY PISCOTTANO, MARK J. VINCENZO, WALTER C. SCAPPINI II, and JAMES KIGHT,

Plaintiffs-Appellants,

- v. -

BRIAN MURPHY, Deputy Commissioner, Department of Correction, individually, and THERESA C. LANTZ, Commissioner, Department of Correction, individually and in her official capacity,

Defendants-Appellees.

_____

Before: KEARSE and SACK, Circuit Judges, and STANCEU, Judge[*].

Appeal from a judgment of the United States District Court for the District of Connecticut dismissing complaint alleging that discipline of state correctional officers for association with the Outlaws Motorcycle Club violated their rights under the First and Fourteenth Amendments to the Constitution.

Affirmed.

_____

[*]Honorable Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation.

KATHLEEN ELDERGILL, Manchester, Connecticut (Beck & Eldergill, Manchester, Connecticut, on the brief), for Plaintiffs-Appellants.

GREGORY T. D'AURIA, Associate Attorney General, Hartford, Connecticut (Richard Blumenthal, Attorney General of the State of Connecticut, Margaret Q. Chapple, Assistant Attorney General, Hartford, Connecticut, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

Plaintiffs Gary Piscottano, Mark J. Vincenzo, Walter C. Scappini II, and James Kight, who are current or former employees of the Connecticut Department of Correction ("DOC" or the "Department"), appeal from a judgment of the United States District Court for the District of Connecticut, Mark R. Kravitz, Judge, dismissing their claims that the defendant DOC officials violated, inter alia, their First Amendment and due process rights to freedom of expressive association and freedom of intimate association by disciplining them on account of their membership in, and their association with members of, the Outlaws Motorcycle Club, pursuant to a Department regulation that plaintiffs contend is impermissibly vague. The district court granted summary judgment dismissing those claims on the grounds that plaintiffs' membership in the Outlaws Motorcycle Club did not constitute expressive association on matters of public concern, that membership in that organization is not an intimate relationship that warrants constitutional protection, and that the pertinent regulation is not unconstitutionally vague as applied to plaintiffs. On appeal, plaintiffs contend principally that the district court erred (1) in finding the "public concern" test applicable to their expressive association claims and failing

-2-

to find that a balancing of the parties' respective interests favored plaintiffs; (2) in failing to find that defendants' actions burdened plaintiffs' intimate personal relationships; and (3) in failing to find the Department regulation void for vagueness as applied. For the reasons that follow, we reject all of plaintiffs' contentions and affirm the judgment.

I.  BACKGROUND

For purposes of defendants' motion for summary judgment, the following facts, many of which were the subject of testimony at a preliminary injunction hearing, see Piscottano v. Murphy, 317 F.Supp.2d 97 (D. Conn. 2004) ("Piscottano I"), were largely undisputed.

Prior to April 2004, plaintiffs were employed by DOC as correctional officers in various prisons in the State of Connecticut ("State"). Piscottano had been so employed for approximately 18 years, Vincenzo for 18½ years, Scappini for 9 years, and Kight for 11½ years. In April 2004, following a hearing for each plaintiff pursuant to Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538-41 (1985) ("Loudermill hearing"), DOC terminated the employment of Piscottano and Kight, and ordered counseling for Vincenzo and Scappini, on account of their association with the Outlaws Motorcycle Club (or "OMC," "Outlaws," or "Club"). In November 2004, Vincenzo was discharged after a further Loudermill hearing.

Defendant Theresa C. Lantz, with nearly three decades of

experience in prison administration as, <u>inter alia</u>, correctional officer, counselor, training manager, warden, and deputy commissioner, became DOC's Commissioner in March 2003. Defendant Brian Murphy, who had two decades of experience as, <u>inter alia</u>, correctional officer, warden, director of prison security, and expert on gangs, became DOC's Deputy Commissioner for Operations in April 2003. The disciplines imposed on plaintiffs were recommended by Murphy; the final decisions to impose those disciplines were made by Lantz.

A. <u>Early Law-Enforcement Information Regarding the Outlaws</u>

Although the proceedings leading to the disciplining of plaintiffs had their immediate impetus in an anonymous letter received by DOC in July 2003 (<u>see</u> report of DOC's Security Division dated September 18, 2003 ("DOC 2003 Report" or "DOC Report"), described in Part I.B. below), local and federal law enforcement agencies had been investigating the Outlaws long before the receipt of that letter.

1. <u>Information from the Federal Government</u>

According to the National Drug Intelligence Center ("NDIC"), which is a unit of the United States Department of Justice, the Outlaws Motorcycle Club has been in existence since 1935 and has multiple chapters in the United States, Canada, Europe, and Australia. An October 2002 report of NDIC ("NDIC Report"), received by DOC, contained descriptions of Outlaws activities and the results of investigations by the Bureau of Alcohol, Tobacco, and

-4-

Firearms ("BATF") and the Federal Bureau of Investigation ("FBI").

According to the NDIC Report, the OMC is involved in the unlawful production and distribution of methamphetamines and in the transportation and distribution of ecstasy, marijuana, and cocaine. Florida chapters obtain kilogram quantities of cocaine directly from Colombian drug trafficking organizations. Other chapters obtain 100-pound quantities of marijuana from Mexico. As a result of BATF and FBI investigations, key officers and members of the Outlaws have been prosecuted for and convicted of various crimes; at the time of the NDIC Report, more than 100 Outlaws members were imprisoned in federal facilities. For example, a 1997 RICO prosecution in Wisconsin led to the conviction of 17 Outlaws members on charges involving bombings, robberies, and six murders during a span of five years. A 2001 RICO trial in Florida revealed a decade-long campaign of terror, using murder, bombings, and other forms of intimidation to control the Club's lucrative cocaine trade in Florida; that trial resulted in the conviction of the Outlaws international president, who was sentenced to two consecutive terms of life imprisonment.

The NDIC Report stated that Outlaws members also engage in other criminal activities including assault, kidnaping, weapons and explosives violations, arson, theft of motorcycles and motorcycle parts, fraud, money laundering, and extortion. The OMC is involved in the sale of stolen motorcycle parts and in the exploitation of female associates as prostitutes. It launders proceeds of its illegal activities through, inter alia, the sale of Club merchandise at sponsored events.

The NDIC Report also stated that the Outlaws has a history

of violent rivalry with the Hells Angels Motorcycle Club ("Hells Angels" or "HAMC"), involving incidents of bombing, arson, and murder. Although the Hells Angels had viewed the northeastern United States as its own territory, the report noted that newly established Outlaws chapters in the United States

> includ[ed] 8 chapters in the HAMC-controlled states of Connecticut, Massachusetts, New Hampshire and New York. This expansion as well as reports of stockpiling weapons and body armor in preparation for confrontations has heightened tensions between OMC and HAMC.

The report noted that 23 heavily armed Outlaws members who were preparing for a fight with the Hells Angels had been arrested in Revere, Massachusetts, on February 23, 2002.

## 2. Information from State and Local Police Forces

In 2002, DOC became aware that the Outlaws had opened a chapter in Waterbury, Connecticut. Officers of the Waterbury Police Department and the State Police conducted surveillance of an Outlaws "coming out" party in Waterbury in May 2002. The police investigation included checking the registrations of the motor vehicles parked at the Outlaws compound. Those inquiries revealed that two of the vehicles belonged to Kight and Scappini; the address of their registrations was the Webster Correctional Institution ("Webster CI"), the DOC facility at which Kight and Scappini were correctional officers. The police relayed this information to DOC.

Other police surveillances were conducted of Outlaws parties held on various dates in 2003, including May 24, July 17, and September 6. The police sent videotapes and still photographs to DOC's Security Division ("Security Division" or "SD"), showing

-6-

Piscottano, Vincenzo, Scappini, and Kight at one or more of those parties. Murphy testified that he first became aware that certain correctional officers might be involved with the Outlaws in May 2003, when a reporter for a major Connecticut newspaper made a freedom-of-information inquiry of DOC. (See Preliminary Injunction Hearing Transcript ("Tr.") at 222, 269.) The reporter requested information concerning DOC investigations, including those with respect to Piscottano, Vincenzo, and Kight. (See DOC 2003 Report at 2.)

DOC received information about the Outlaws and its activities from State Police Trooper Richard Williams, who had long experience in investigating so-called "one-percent" motorcycle gangs--a term derived from an American Motorcycle Association official's remark in the 1950s that 99 percent of all bikers were law-abiding, and thus "only" one percent of the motorcycles on the roads belonged to persons who were trouble-makers. Williams informed DOC that the OMC is a self-proclaimed one-percent gang; that, like other one-percent motorcycle clubs, the Outlaws has distinctive patches that members wear on their clothing, including a "1%" patch; that these patches, known as "colors," signify membership in the Club; that their colors are a source of pride and are not loaned out; that the colors must be returned if the member leaves the Club, unless he has been a member in good standing for more than a few years; that women cannot be members of the Club, but wives and girlfriends are allowed to wear "Property of the Outlaws" colors; and that these colors, too, must be returned if the member leaves the Club, unless he has been a member for a long period.

Williams testified that he had received information from law enforcement agencies around the country about illegal activities of the Outlaws. These included narcotics trafficking, prostitution, rape, and murder.

DOC was informed by Williams and the Waterbury police of a drive-by shooting that took place on June 29, 2003. According to Williams, several shots were fired, including two into the door of a social club located in a building that also housed the Outlaws Motorcycle Club. According to the police incident report, a witness stated that the shooter was a white male in his 30s; that after the shots were fired, members of the Outlaws came running out and inquired about the color of the car and the driver; and that when the witness told them the car was dark and the driver was a white male, the Outlaws appeared to know who the shooter had been.

B. The July 6, 2003 Anonymous Letter and DOC's Investigation

On July 6, 2003, a week after the June 29 drive-by shooting, Lantz received an anonymous letter stating, inter alia, that the Outlaws, described as arch rivals of the Hells Angels, had recently established a chapter in Connecticut, and predicting that there would ensue an "all out gang war in the Waterbury area this summer and innocent people are going to get hurt because of them" (Anonymous Letter). The letter stated that at least five DOC correctional officers were members of the Outlaws, including one named "Gary," whose last name the author did not know, and another, whose name might be "Jim Kite," who had threatened another person with a gun in a road-rage incident. (Id.) The letter referred to

"[t]hese men" as "1% outlaw motorcycle club members" who, while having their salaries and pensions funded by the citizenry, were "terrorizing" "the citizens . . . in Waterbury and elsewhere in Ct." (Id.)

A DOC regulation prohibits DOC employees from, inter alia, "[e]ngag[ing] in conduct that constitutes, or gives rise to, the appearance of a conflict of interest," and "[e]ngag[ing] in unprofessional or illegal behavior, both on and off duty, that could in any manner reflect negatively on the Department of Correction." See DOC Administrative Directive 2.17, Employee Conduct ("Directive 2.17"). Lantz forwarded the Anonymous Letter to Murphy and to SD, the DOC unit responsible for investigating questions of serious staff misconduct, for further review.

On July 12, 2003, SD investigator Luis Irizarry conducted surveillance of a party at the Outlaws Waterbury clubhouse. He observed Piscottano, Vincenzo, and Kight at that event. In August 2003, Lantz ordered a formal investigation into the Anonymous Letter's allegations.

1. DOC's September 2003 Interviews of Plaintiffs

In September 2003, the Security Division conducted interviews of Piscottano, Kight, Vincenzo, and Scappini. Piscottano and Kight stated that they had been members of the Outlaws for a time but had resigned; Vincenzo and Scappini denied ever having been members of the Outlaws. All stated that they had attended Outlaws functions even as non-members. The ensuing DOC report included the following descriptions of the interviews.

-9-

Piscottano stated that he had been a member of the Outlaws, initially probationary and then full-fledged, for a total of about a year; he resigned his membership in the Outlaws in the spring of 2003. He stated that he had attended a number of Outlaws functions during the summer of 2003. Piscottano stated that he knew that Randy Sabettini (a correctional officer who was also originally a plaintiff in this action) had at one time been a member of the Outlaws, but did not know of any other correctional officers who were members. Piscottano stated that he "d[id] not know that the Outlaws [we]re involved in any criminal activity," and said, "if they were I wouldn't be there." Further, taken in the light most favorable to Piscottano, the record indicates that he had been informed by Sabettini prior to September 2003 that Sabettini had inquired of, and received assurances from, DOC supervising officials that an officer's association with the Outlaws would not pose a problem so long as the officer himself was not involved in criminal activity.

Kight, in his interview, stated that after a six-month probationary period, he had become a full member of the Outlaws in September 2002. He took a leave of absence in June 2003, and he officially resigned in July 2003 and turned in his colors. He stated that he had attended some Outlaws functions after resigning from the Club, most recently in the week before his interview. He knew that Piscottano had been a member of the Outlaws.

Kight said he was "not aware of any illegal activity by any of the members of the club . . . . There may be criminal activity in other states but none in Connecticut as far as [he]

-10-

kn[e]w." He also stated that he was aware that one Danny Hall, an Outlaws member he had known for 25 years, had been incarcerated on several occasions at the Webster CI where Kight was a correctional officer. Kight said of Hall, "[h]e never asked me to do any favors or anything illegal for him while I performed my job."

Vincenzo, who said he had never been a member of the Outlaws, stated that he did associate with some members of the Club and had attended OMC functions in Waterbury and in Brockton, Massachusetts. He had no knowledge of any illegal activity of the Outlaws and did not know any members of the Outlaws who had previously been incarcerated. Vincenzo acknowledged that, in a videotaped surveillance of the Outlaws party in Waterbury on July 12, 2003, he was seen wearing an Outlaws Support T-shirt.

Vincenzo stated that he had "heard that there might be some type of issue with guys that ride in motorcycle clubs," and he had sought official advice as to whether affiliation with the Outlaws would threaten his employment with DOC. He stated that, while attending a retirement party in the summer of 2003, he had asked a DOC captain to make inquiry of DOC's director of security. Vincenzo said he was told that the director believed there would be no problem if Vincenzo himself was not committing a crime. Vincenzo stated that he received essentially the same advice from a local chief of police.

Scappini, who stated that he had never been a member or a prospect of the Outlaws or associated with the Club, stated that he had attended parties and functions with the Outlaws. He had seen Kight, with whom he worked at the Webster CI, at some of the Outlaws

-11-

functions.  Scappini stated that he was "not aware of" and had not "seen any illegal activity by any member of the Outlaws Motorcycle Club."  He said, however, that he had recognized Danny Hall at Outlaws functions and was aware that Hall had been an inmate at the Webster CI.  Scappini stated that Hall "never asked me to do anything illegal while he was incarcerated."

2.  The DOC 2003 Report

Following these interviews and the gathering of additional information from federal, State, and local law enforcement agencies, the Security Division sent Lantz the DOC 2003 Report.  The report recounted, inter alia, law enforcement experiences with the Outlaws, from both federal and local perspectives, as summarized in Parts I.A.1. and I.A.2. above, including the NDIC Report's description of the Outlaws' drug trafficking, violence, and other criminal activity.

The DOC Report also summarized the NDIC Report's description of the Outlaws membership requirements, in part, as follows:

> Outlaws members must be male, at least 21 years old and own an[] American-made motorcycle with at least a 1,000 cc engine.  To be accepted as a member, an individual must begin as an associate or "hangaround" and must perform some service for the chapter.  If chapter officers determine that the hangaround has membership potential, he becomes a "prospect", and when he is deemed ready for formal consideration, he become[s] a "probate".  For a period of at least 6 months, the probate officially is evaluated for membership and may be asked to perform some illegal activity to prove his loyalty. To obtain full membership the probate must attend one national event and receive the unanimous vote of

the chapter. . . . A member in good standing can leave the club or change chapters at any time after 1 year. However, a member must have at least 10 years with the club before he is permitted to keep OMC emblems and Patches. . . .

Members wear black leather jackets. The club patches, known as colors, are placed on the front and back of the jackets. Outlaws patches are usually black and white lettering. The skull and crossed pistons logo is outline[d] in red and worn on the back of the jacket. OMC members maintain that the skull's glaring red eyes protect the wearer and "watch out for trouble from behind." Above the logo is a top rocker patch with the name Outlaws, below the logo is a bottom rocker that designates the chapter's location. A triangular patch is worn on the left front shoulder with the letters AOA standing for American Outlaws Association surrounding a hand with the middle finger extended. . . . On the other shoulder is worn a triangular 1 % patch. The 1 % refers to a statement made by the former president of the American Motorcycle Association that 99 percent of the motorcycling public are honest, law abiding citizens and that only 1 percent are trouble makers. A patch with the letters GFOD, standing for the Outlaws' motto "God Forgives, Outlaws Don't" also is worn on the front of the jacket.

Associates and prospects wear only front patches to identify their status. Probates wear upper Probationary and lower Outlaws rocker patches on their backs. Female associates wear the traditional OMC back patch with "Property of" on the top rocker and the name of the owner on the bottom rocker. . . . Colors are held in the highest esteem. A member who loses his colors is fined $500 and demoted to probate status.

(DOC 2003 Report at 4 (emphases added).)

The DOC 2003 Report summarized SD's September 2003 interviews of plaintiffs, see Part I.B.1. above, and stated that there were discrepancies between some of the interview statements and the facts found in DOC's investigation. In particular, the statements by Piscottano and Kight that they had "gotten out [of the Outlaws] early in 2003" were questioned, given that during the

-13-

period after they said they had withdrawn, Piscottano and Kight were "positively identified and admitted to being in attendance during one or several of the functions that were sponsored by the Outlaws Motorcycle Club." (DOC 2003 Report at 14.) Kight, during that period, was observed wearing Outlaws colors despite having resigned after being a member for less than a year and despite the Outlaws bylaw forbidding post-resignation retention of colors except by those who have been members for at least 10 years. One such observation was made by Irizarry, who conducted surveillances of the Outlaws and was the author of the DOC 2003 Report:

> On September 5, 2003 while out with friends at Carmine's Café in Waterbury, Major Irizarry observed several individuals on motorcycles arrive outside of the Café. All of the individuals we[re] wearing leather jackets or vest[s] identifying them with the Outlaws Motorcycle Club. Major Irizarry positively identified Officer James Kight as one of the individuals that was with the group. Officer Kight was observed wearing a leather jacket with the Outlaws rocker on the back.

(Id. at 13 (emphasis added); see also id. at 15 ("Kight stated during his interview that he was riding with members of the Outlaws on the evening of September 5, 2003, but was not wearing any colors, since he was no longer a member. But I clearly observed him wearing his colors upon arriving and parking in front of the Café.").)

The DOC Report also stated that during one or more of the Outlaws events at which Piscottano, Kight, Vincenzo, and Scappini were seen, several known felons were also observed. (See id. at 14.) At a May 2003 Outlaws event, several of the "known felons . . . were wearing full patched Outlaw jackets." (Id. at 12.) Attending a later Outlaws event was a felon who had just been released from prison in July 2003. (See id. at 14; see also id. at

-14-

11 (Hall, whom Kight described as having been incarcerated on several occasions at the prison to which Kight was assigned, had been released in July 2003).) The report stated that it was a matter of "clear concern" that

> correctional staff [are] associating with known felons and other members of this organization. The information in this report identifying the criminal involvement, producing and distributing of methampheta[m]ine and other narcotics indicates that the Outlaws Motorcycle Club are [sic] becoming a great threat to the general public and law enforcement agencies.

(Id. at 15.) The report found that by associating with the Outlaws, the correctional officers in question had, inter alia, (1) "jeopardize[d] the security of the unit, health, safety, or welfare of the public, staff or inmates," (2) "[e]ngage[d] in conduct that constitutes, or gives rise to, the appearance of a conflict of interest," and (3) "[e]ngage[d] in unprofessional . . . behavior . . . that could . . . reflect negatively on the Department of Correction." (Id. at 15-18.) The report concluded that the officers were therefore "in clear violation" of Directive 2.17. (Id. at 15.)

The DOC 2003 Report also noted that Directive 2.17 requires employees to "[c]ooperate fully and truthfully in any inquiry or investigation conducted by the Department of Correction and any other law enforcement or regulatory agency." (Id.) The DOC Report concluded, inter alia, that "[i]t has been determined that . . . Piscottano[] and Kight were not truthful during the investigation, since they . . . claim to have gotten out of the Outlaws early in 2003, but continue to attend functions hosted by the Outlaws." (Id.)

-15-

C.   The Individual Proceedings and the Imposition of Discipline

In late 2003, Lantz ordered that separate proceedings be initiated against Piscottano, Kight, Vincenzo, and Scappini, as well as Sabettini; that each officer be placed on paid administrative leave pending conclusion of his proceeding; and that each be given a copy of the DOC 2003 Report and be afforded an opportunity at a Loudermill hearing to present any mitigating evidence and to dispute the allegations of the DOC Report.

Loudermill hearings were conducted and were followed by Security Division investigations into the evidence presented by the officers at those hearings and into each officer's activities with the Outlaws subsequent to his SD interview in September 2003. In February 2004, an individual report ("SD 2004 Report") was prepared with respect to each of the plaintiffs. Each report reiterated the historical perspective of the Outlaws set out in the DOC 2003 Report and noted that

> [t]hough the OMC has only beg[u]n to become
> established in New England within the past 5 years,
> law enforcement sources have stated that there have
> already been arrests and violent altercations
> between the OMC and [the Hells Angels]. Though
> there are several on-going investigations concerning
> the OMC in New England, law enforcement sources were
> unable to provide specifics [so] as to not
> jeopardize the integrity of their cases.

(E.g., SD 2004 Report on Piscottano at 3-4.) Each report added the observation that

> [a]s with other chapters of the OMC, law enforcement
> sources expect the newly founded New England
> chapters to follow suit with the criminal activity
> of older established chapters, which has been made

apparent by information received from current on-going investigations,

(e.g., id. at 6), citing as "[a]n example of the criminal progression of the newly formed New England chapters" the February 2002 arrests of 23 heavily armed Outlaws members who were preparing for a fight with the Hells Angels in Revere, Massachusetts (e.g., id.).

Each report proceeded to describe the officer's Loudermill hearing statements and the evidence turned up in SD's follow-up investigation. As described below, although the September 2003 interviews and the DOC 2003 Report, which had been given to the plaintiffs, had put all of them on notice that the Outlaws was considered by federal, State, and local law enforcement agencies to be engaged in criminal activity, and that DOC was concerned about plaintiffs' association with the Outlaws, the individual reports found that Kight and Piscottano had continued to wear Outlaws colors and to involve themselves in Outlaws-related activities.

1. Kight

At his Loudermill hearing, Kight took the position, inter alia, that he had not (as described in the DOC 2003 Report at 13) been wearing an Outlaws rocker patch on his jacket at Carmine's Café on September 5, 2003, and he stated that there had been another DOC correctional officer at that café at the time who would so testify. In the Security Division's post-Loudermill-hearing interview, Kight identified his witness as Lawrence Andrews, a correctional officer at the Webster CI where Kight was assigned.

SD then interviewed Andrews. Andrews said he had been

-17-

present in Carmine's Café on one occasion when Kight and a woman came into the café, and that Kight had not been wearing Outlaws colors. However, Andrews could not remember the date of that occasion and could not say that it was September 5. (See SD 2004 Report on Kight at 6.) On the occasion he recalled, Kight and the woman had come in alone (see id.); Kight, however, in his September 2003 interview, had stated that he was with members of the Outlaws on the evening of September 5 (see DOC 2003 Report at 15). The 2004 report noted that SD investigator Irizarry himself had observed Kight arrive at that café on September 5, with several other individuals wearing Outlaws colors, and had observed Kight wearing a black leather jacket with the Outlaws rocker on the back. (SD 2004 Report on Kight at 6-7.)

The report also noted that although Kight stated he had resigned from the Outlaws in July,

> he has admitted wearing colors during an OMC Christmas Party on December 20, 2003. When asked if the colors were his, Officer Kight stated that the colors were brought down for him to wear out of respect by members of the OMC. Officer Kight admitted wearing an OMC insignia belt while at the Christmas Party.

(Id. at 7.)

The report on Kight also stated that SD had learned that Kight and Piscottano were involved in a physical altercation at Chaser's Café in Bristol, Connecticut, on October 25, 2003. An employee of that café informed investigators that Kight was injured when a member of the Crossroads Motorcycle Club hit Kight in the face with a beer mug, and that gunshots were fired. Kight was dragged out of the café by one of the Outlaws members. The café

employee stated that Kight and Piscottano, as well as certain other full-patch members of the Outlaws whom the employee identified by name, were all wearing Outlaws colors.

After the fight, Kight was hospitalized and underwent surgery for the injuries to his face (a broken jaw and a broken nose, according to Kight's testimony at the preliminary injunction hearing). Kight admitted that he had been at Chaser's Café on the night of October 25 and had been knocked unconscious; but he said he had no idea who struck him, and he maintained that his injuries were in fact caused by his slipping and falling in his bathtub while taking a shower. (See SD 2004 Report on Kight at 7-9.) According to the State Police, Kight's "injuries were inconsistent with a fall and were consistent with someone involved in a physical altercation." (Id. at 7.)

The SD report found, inter alia, that although Kight contended that he had not engaged in conduct that would be considered a conflict of interest,

> he continues to associate himself with members of the OMC by attending functions such as the Christmas Party on December 10 [sic], 2003[, e]ven after being placed on Administrative Leave by the DoC for his association with a known criminal entity, which is currently being investigated by State and local law enforcement for criminal/illegal activities.

(SD 2004 Report on Kight at 9.) The report concluded that Kight had violated Directive 2.17 by, inter alia, engaging in unprofessional behavior that could reflect negatively on DOC and give rise to the appearance of a conflict of interest, and by failing to cooperate fully and giving false testimony in the DOC investigation. (Id. at 10.)

-19-

## 2. Piscottano

The Security Division report on Piscottano stated that SD had conducted a post-Loudermill-hearing interview of Piscottano, seeking clarification of his proffered mitigation, but that Piscottano failed to provide detailed information in response to most of SD's questions. He said he had no knowledge about the Outlaws national organization and no recollection of the specific period when he was an Outlaws member or when he attended Outlaws functions. (See SD 2004 Report on Piscottano at 6 ("Piscottano failed to provide this office with specific time frames concerning his membership and/or attendance at OMC functions, stating that he was unsure, couldn't recall or would have to guess.").)

The report noted that Piscottano placed his resignation from the Outlaws in the spring of 2003, but that

> he stated that he still attended OMC functions including parties at the Waterbury OMC clubhouse and Lobsterfest in Brockton, Massachusetts (party sponsored by the Brockton OMC). Officer Piscottano also stated that most recently he attended a Christmas party at the Waterbury OMC clubhouse on December 20, 2003 (the party followed Officer Piscottano's Loudermill and being advised that his involvement with the organization may result in his dismissal from state service).

(Id.) SD had learned of Piscottano's presence at the Outlaws Christmas party because he had been seen there by members of the State Police who were serving a search warrant at the Outlaws clubhouse (although they had "extreme difficulty entering the building, as the interior walls of the clubhouse were covered with sheet metal and the door was steel reinforced"), seeking illegal weapons believed to be in the possession of a known Outlaws member who was attending the event. (Id.) In his SD interview, Piscottano

-20-

was critical of the police, stating "I couldn't believe they were doing this at a Christmas party." (Transcript of December 22, 2003 SD Interview of Piscottano, at 12.)

Piscottano was also questioned about the October 25, 2003 incident at Chaser's Café at which Kight was injured (see Part I.C.1. above). Piscottano denied being at that café on that date; said he was unsure whether he had ever been there; and said he did not know, offhand, where it was located. The report stated, however, that the café "employee was shown several pictures of OMC members and clearly identified Officer Piscottano and Officer Kight as being involved in the altercation while wearing their OMC colors." (SD 2004 Report on Piscottano at 7.)

The report noted that Kight had been admitted to Waterbury Hospital on the night of October 25 with severe facial injuries that required surgery and that Piscottano admitted having visited Kight in the hospital. However, despite that visit, Piscottano stated that he did not know what had precipitated Kight's admittance to the hospital, "nor did he inquire." (Id.)

The SD report found that

> [u]pon review of Officer Piscottano's Loudermill reply and questioning to clarify his alleged mitigation, this office has concluded that Officer Piscottano continues to be actively involved with the Outlaw Motorcycle Club and was less than truthful in regards to his membership. Though Officer Piscottano alleged that he is no longer a member of the OMC, this office has not been presented with any mitigating evidence that would support this claim. . . .
>
> This office has also determined that Officer Piscottano was less than truthful in regards to the incident at Chaser's Café on October 25, 2003, where Officer Kight was struck in the face and knocked unconscious by members of the Crossroads Motorcycle

-21-

Club and James Gang (motorcycle club). Officer Piscottano was identified (via photograph) by an employee of the café as being present during the melee, though he stated that he was not.

(Id. at 7.) The report also found it less than credible that Piscottano would visit Kight in the hospital following the surgery on Kight's nose and jaw, and neither know nor ask what had happened. (See id. at 7-8.)

The SD report concluded that although members of the Waterbury chapter of the Outlaws had not been charged with felonious activity, it "is currently under investigation by several Federal, State and local law enforcement entities for just such activity," and that "[i]t should be noted that Officer Piscottano continues to attend OMC events and socialize with the organization's members, even after being advised that the agency was investigating his involvement with the organization." (SD 2004 Report on Piscottano at 8.) The report concluded that Piscottano had violated Directive 2.17 by engaging in unprofessional behavior that could reflect negatively on DOC and give rise to the appearance of a conflict of interest, as well as by failing to cooperate fully in the DOC investigation and giving false testimony. (See id.)

3. Vincenzo

The post-Loudermill hearing report on Vincenzo described an interview in which Vincenzo reiterated the statements he had made during his September 2003 interview that, inter alia, he had inquired of a DOC captain and, indirectly, the DOC director of security as to the propriety of riding with motorcycle clubs and had been informed that it was not inappropriate so long as he was not

-22-

committing any crimes. SD investigators spoke with the DOC captain of whom Vincenzo had inquired and with the security director; both essentially substantiated Vincenzo's account. (SD 2004 Report on Vincenzo at 7-8.)

Vincenzo also stated that if any DOC official had informed him that it was inappropriate to ride around with felons and had pointed out individuals who were felons, he "would have been gone." (Id. at 7.) Vincenzo stated that although he had attended Outlaws events in the past, he had not done so since September 2003. The report indicated that SD had received no information indicating Vincenzo's presence at any Outlaws event since that time. (See id. at 8.)

The report concluded that Vincenzo's prior association with the Outlaws constituted unprofessional behavior that could reflect negatively on DOC and give rise to the appearance of a conflict of interest. (See id. at 8-9.)

4. Scappini

In SD's post-Loudermill hearing interview of Scappini, Scappini essentially repeated the statements he had made in his SD interview in September 2003, i.e., that he had never been an associate, prospect, or member of the Outlaws, although he had attended several Outlaws outings in prior years. (SD 2004 Report on Scappini at 7.) The report stated that SD had received no information indicating Scappini's presence at any Outlaws event after May 24, 2003. (See id.)

The report concluded that Scappini's prior association with the Outlaws constituted unprofessional behavior that could reflect negatively on DOC and give rise to the appearance of a conflict of interest. (See id. at 7-8.)

### 5. The April 2004 Dismissals and Counseling Letters

Murphy, as deputy commissioner in charge of operations, reviewed the SD reports on the individual officers and gave Lantz his view that it was inadvisable to employ correctional officers who were affiliated with the Outlaws. (See Memorandum from Murphy to Lantz dated March 23, 2004 ("Murphy Mem.").) Murphy testified that after receiving the NDIC Report, he had sought and received corroborating information from the State Police, from law enforcement agencies in Massachusetts and New Hampshire, and from federal agencies including the BATF and the United States Drug Enforcement Administration. (See Tr. 231-32.) And "the more information [he] got, the more [he] became concerned." (Id. at 236.)

DOC was aware of at least two members of the Outlaws incarcerated in DOC prisons and of members of the Hells Angels and other motorcycle clubs incarcerated at several DOC prisons. Murphy testified that DOC had experienced gang-rivalry incidents of inmate violence in the past between members of gangs other than the Outlaws and the Hells Angels, including one incident in which an inmate was beaten to death with a putter and another in which an inmate was firebombed to death. (See Tr. 235, 258.) Although there had been no incidents in DOC-run prisons involving the Outlaws, and the

-24-

Outlaws was not on DOC's own list of organizations that were known to pose security risks (see id. at 259-60, 276-77), DOC had been informed by the Federal Bureau of Prisons that the Outlaws Motorcycle Club is listed as a safety threat group within the federal prison system (see, e.g., id. at 293).

In his memorandum to Lantz, Murphy noted that the historical involvement of the OMC "around the country" in "illegal, illicit, violent, and dangerous activities" was "substantiated" (Murphy Mem. at 1), and that law enforcement surveillance of the Connecticut chapter of the Outlaws had made it "clearly evident that the OMC membership involves several convicted felons" (id. at 2). Murphy also noted that "gang affiliation and loyalties to the gang do not cease with incarceration" and that a correctional officer affiliated with the Outlaws, supervising inmates belonging to a different gang, "could be subjected to criticism by inmate rival gang members, alleging inappropriate treatment based on rival status of the gangs." (Id.) Such an officer could also be subjected to "retaliation by inmates." (Id.) For example, a State Police ("CSP") task force member had reported on his recent conversation with a leader of the Hells Angels in which

> the Hells Angels leader notified the CSP member of "cops" being with the Outlaws; referring to the correctional officers. The Hells Angels leader spoke of the feud with OMC, and warned that the officers were in jeopardy due to their membership with OMC.

(Id.)

Murphy concluded that the association of DOC correctional officers with the Outlaws "severely jeopardizes the security of the [prison] facilities and protection of the public" and "could also

-25-

severely impact the integrity of the agency and its security." (Id. at 2-3.)  Murphy concluded that

> [t]he staff members who do not appear to be members [of the Outlaws] should be warned that continued involvement with this gang may result in termination from state service.  Those positively identified as members should be dismissed from state service.

(Id. at 3.)

Lantz agreed with Murphy's assessments and concerns.  (See generally Tr. 326-27.)  At the preliminary injunction hearing, she testified that DOC works closely with other law enforcement agencies and has staff members participate in task forces on gang activity.  (See id. at 310.)  Lantz testified that the concerns for possible conflicts of interest, coupled with the findings that Piscottano and Kight had been untruthful in their interviews with SD investigators, led her to believe that there "was a breach of integrity, certainly unprofessional," that "negatively reflected on the agency." (Id. at 327.)  Asked to explain why she believed Department operations could be negatively affected by a correctional officer's untruthfulness, Lantz stated,

> we have a finding of untruthfulness and if no action is taken and they're allowed to go back to work or allowed to carry out their duties, anything else they might do in the performance of their duties could make the agency quite vulnerable by the fact that the agency has already found them untruthful.

(Id. at 332 (emphasis added).)

Lantz followed Murphy's recommendations.  In April 2004, Kight and Piscottano were informed, by the wardens of the prisons to which they were respectively assigned, that they were being dismissed, effective May 6, 2004, for violating Directive 2.17.  The letter to Kight stated, in pertinent part, as follows:

This letter serves to inform you that you are being dismissed from State Service for just cause as evidenced by your violation of Administrative Directive 2.17.

Specifically, based upon a Security Division investigation into your conduct, it was determined that you were less than truthful when questioned about your association with the Outlaw[s] Motorcycle Club. Your failure to be truthful jeopardizes the safety and security of yourself, your co-workers and the inmates, which cannot be tolerated or condoned.

(Letter from Warden James E. Dzurenda to Kight dated April 22, 2004.) Piscottano's termination letter was essentially the same. (See Letter from Warden Wayne T. Choinski to Piscottano dated April 21, 2004.)

Vincenzo and Scappini were not dismissed; they were issued "Formal Counseling" letters for engaging in unprofessional conduct in violation of Directive 2.17. Each letter stated that "a Security Division investigation substantiated that you engaged in activities that negatively reflected on the Department of Correction." (E.g., Letter from Warden James E. Dzurenda to Scappini dated April 22, 2004.) The counseling letters stated that "[t]his type of conduct will not be tolerated," and that "[a]ny recurrence of this behavior will result in more severe disciplinary action being taken against you up to and including dismissal." (E.g., id.)

6. The November 2004 Discharge of Vincenzo

In July 2004, Lantz received a letter from the president of the prison employees' union asking whether Vincenzo would violate any Department regulation if he attended a fund-raising event to be co-sponsored by the Outlaws at the American Veterans ("AmVets") hall in Enfield, Connecticut, from noon to 6 p.m. on July 11, 2004.

Lantz responded that if Vincenzo attended the event, he would be violating Directive 2.17. Vincenzo received a copy of Lantz's response prior to the July 11 event.

Lantz thereafter received information that Vincenzo had proceeded to attend the July 11 Outlaws event; she instructed SD to investigate. SD obtained and reviewed videotapes that had been made during surveillance of the event by the Enfield Police Department. In a memorandum dated August 13, 2004 ("SD August 2004 Report on Vincenzo"), SD reported that on the police surveillance tape covering the segment of the afternoon of July 11 from 1:53 p.m. to 4 p.m., Vincenzo was seen arriving at the AmVets hall at approximately 3:43 p.m. (See SD August 2004 Report on Vincenzo at 2.) He parked his motorcycle, greeted and hugged members of the Outlaws, and remained in the company of Outlaws members until those attending the party departed at approximately 6:10 p.m. "Vincenzo [wa]s seen riding away with the Outlaws members," and "at th[at] time he [wa]s observed wearing a black short sleeve tee-shirt which appeared to be a 'Support' (Outlaws MC) tee-shirt." (Id.)

After reviewing the videotape, SD interviewed Vincenzo. Although Vincenzo maintained that he did not "attend" the event (Transcript of July 26, 2004 SD Interview of Vincenzo, at third unnumbered page), he concededly went to the AmVets hall on July 11, 2004, before the 6 p.m. scheduled conclusion of the event (see id. at second unnumbered page ("I don't even know what time I went down there. . . . I think I went down there about five, five thirty somewhere around there.")). Vincenzo acknowledged that upon his arrival he hugged and shook hands with members of the Club, that

while there he consumed a few beers with Outlaws members (see id. at second-third unnumbered pages), and that before he left he donned an Outlaws "support shirt" that had been brought to him (id. at fourth unnumbered page).

Lantz ordered that Vincenzo be given a new Loudermill hearing to determine whether his conduct on July 11, 2004, warranted discharge or other discipline. Following the new Loudermill hearing, Lantz determined that Vincenzo should be dismissed for violating Directive 2.17. He was discharged on November 19, 2004.

D. The Present Action and the Decision of the District Court

Immediately following the April 2004 dismissals of Piscottano and Kight and the counseling letters to Vincenzo and Scappini, those four officers, along with Sabettini who also had been discharged, commenced the present suit under 42 U.S.C. § 1983 against Lantz, Murphy, and the wardens who had signed the discharge and counseling letters, asserting claims that those actions violated, inter alia, plaintiffs' First Amendment rights. Plaintiffs moved, unsuccessfully, for a preliminary injunction requiring rescission of the disciplinary actions. See Piscottano I, 317 F.Supp.2d at 99-102.

Following the denial of the preliminary injunction motion, several amended complaints were filed, which, inter alia, omitted Sabettini as a plaintiff and omitted the wardens as defendants. To the extent pertinent to this appeal, the third (final) amended complaint ("Complaint"), served in November 2004, alleged that Directive 2.17, in "prohibit[ing] . . . [e]ngage[ment] in

-29-

unprofessional . . . behavior, both on and off duty, that could in any manner reflect negatively on the Department," is "unconstitutional as applied in this case, in that it violates the First Amendment because it is . . . void for vagueness" (Complaint ¶¶ 26, 27), and that defendants' imposition of discipline on plaintiffs (including the then-recent discharge of Vincenzo for his July 11, 2004 violation of Directive 2.17) violated their rights to freedom of association (see id. ¶¶ 25, 28).

Following a period of discovery, both sides moved for summary judgment. Defendants sought summary dismissal of the First Amendment claims, arguing principally (1) that plaintiffs' association with the Outlaws did not constitute speech on a matter of public concern, as required by Connick v. Myers, 461 U.S. 138 (1983), and (2) that plaintiffs' interest in associating with the Outlaws is, in any event, outweighed by the State's interest in, inter alia, maintaining safe prison facilities, and hence is not protected by the First Amendment. They argued that Directive 2.17 is not unduly vague as applied to plaintiffs' association with the Outlaws.

Plaintiffs opposed defendants' motion, arguing principally (a) that the Connick public-concern requirement should not be applied to claims of freedom of association or to an employee's off-duty speech that does not relate to his employment, and (b) that Directive 2.17 is impermissibly vague as applied to plaintiffs because it has no objective content setting forth standards or giving fair notice as to what conduct is proscribed. Plaintiffs also cross-moved for summary judgment in their favor. In

-30-

addition to the arguments made in opposition to defendants' motion for summary judgment, plaintiffs argued that they were entitled to judgment on the void-for-vagueness claim because they had no reason to believe that the Connecticut chapter of the Outlaws was involved in any criminal activity and they had been led to believe by their superiors at DOC that so long as plaintiffs themselves were not involved in criminal activity, DOC did not disapprove of their association with the Outlaws.

In a Memorandum of Decision dated June 9, 2005, see Piscottano v. Murphy, No. 3:04CV682, 2005 WL 1424394 (D. Conn. June 9, 2005) ("Piscottano II"), the district court granted defendants' motion for summary judgment dismissing the Complaint and denied plaintiffs' cross-motion. The court dismissed plaintiffs' expressive association claims on the ground that plaintiffs had not shown that their association with the Outlaws constituted speech on a matter of public concern. See id. at *5-*6. The district court noted that this Court in Cobb v. Pozzi, 363 F.3d 89 (2d Cir. 2004), had stated that "'[w]e . . . join[]'" other circuits and "'hold that a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern.'" Piscottano II, 2005 WL 1424394, at *3 (quoting Cobb, 363 F.3d at 102). Although the Cobb Court had then proceeded to assume, rather than to decide, that the conduct before it in fact touched on a matter of public concern, the district court concluded that the Cobb statement of principle was intended as guidance to the district courts and should be followed, see Piscottano II, 2005 WL 1424394, at *3. The district court

-31-

reasoned, alternatively, that because the public-concern test is applicable to speech, which is explicitly protected by the First Amendment, and freedom of association is not mentioned in the Amendment but is derivative of freedom of speech, it would be anomalous to hold that a plaintiff could prevail on a freedom-of-expressive-association claim upon making a lesser showing than that required for proof of a violation of the right to freedom of speech itself. See id. at *4. The court also concluded that plaintiffs were not exempt from the public-concern test for their speech or expressive associations during their off-duty hours. See id. at *6.

The court noted that, in response to a question at oral argument, "[p]laintiffs' counsel conceded . . . that if Plaintiffs are required to satisfy the public concern requirement, their First Amendment claim must fail . . . ." Id. at *2. The court accordingly dismissed plaintiffs' expressive association claims.

As to plaintiffs' intimate association claims, the district court noted, as set forth more fully in Part III below, that in addition to the undisputed fact that "many of the Outlaws' activities and events--such as motorcycle rides, cookouts and parties--are freely open to non-members," it was "apparent that [the Outlaws] is not a small group" and that it also is not "a particularly selective organization." Id. at *7. The district court thus concluded that association with the Outlaws "falls outside of the range of intimate associations that are protected by the First Amendment." Id. at *8.

As to plaintiffs' due process challenge to Directive 2.17, the district court concluded that, even viewing the counseling

-32-

letters as discipline and viewing plaintiffs as having been disciplined because of their association with the Outlaws, and not because of any untruthfulness, Directive 2.17 is not unconstitutionally vague as applied to the Plaintiffs because its terms "amply encompass[] the conduct with which Plaintiffs, by their own characterization, were charged--that is, associating with a group that Defendants understood to be 'a criminal enterprise,'" id. at *11 (quoting Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Plaintiffs' Summary Judgment Memorandum") at 48).

Addressing plaintiffs' assertion that they did not know the Outlaws was a criminal organization, the district court pointed out that it was an "undisputed fact that in November 2003 each Plaintiff received a copy of the DOC's report outlining numerous instances of criminal conduct by Outlaws members and officials." Id. at *12. The court also noted that Kight and Piscottano had "continued to attend Outlaws events even after being placed on administrative leave pending DOC's full investigation of their association with the Outlaws," id., and that "Vincenzo also continued to attend the Outlaws' activities even after being told expressly that attending Outlaws events would result in termination," id. The district court concluded that

> [t]here can be no serious dispute that a reasonable corrections officer would recognize that a regulation prohibiting him from "[e]ngaging in unprofessional or illegal behavior--on or off duty-- that could negatively reflect on the department" would bar him from associating with a group that has been identified, at least at the national level, as having been involved in criminal and gang-related

-33-

activities. Id. (quoting DOC Employee Handbook).

Finally, the court rejected the claims of Piscottano and Vincenzo that Directive 2.17 is impermissibly vague because supervisors had misled them to believe that the directive did not prohibit their association with the Outlaws. Id. at *13. Citing Cox v. Louisiana, 379 U.S. 559 (1965), the court stated that allegations of even official misinformation do not "render an otherwise constitutional regulation void for vagueness" where the party's conduct is clearly within the scope of the regulation. Piscottano II, 2005 WL 1424394, at *13. The court noted that Piscottano and Vincenzo had not asserted any claim of estoppel. See id.

Judgment was entered dismissing the Complaint in its entirety. On this appeal, plaintiffs pursue their expressive association, intimate association, and void-for-vagueness claims.

## II.  FREEDOM OF EXPRESSIVE ASSOCIATION

In challenging the dismissal of their expressive association claims, plaintiffs contend principally that the district court erred (a) in ruling that they were required to show that their expressive conduct was on a matter of public concern, and (b) in failing to rule that their off-duty association with the Outlaws was unrelated to their employment and hence was protected by the First Amendment. For the reasons that follow, we affirm the dismissal of

-34-

these claims, although our analysis differs from that of the district court.

A.   The Applicable Legal Principles

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.   Although freedom of expressive "association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." Healy v. James, 408 U.S. 169, 181 (1972).

The First Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, see, e.g., Stromberg v. California, 283 U.S. 359, 368 (1931), thus prohibits a state, as sovereign, from abridging an individual's "'right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends,'" Boy Scouts of America v. Dale, 530 U.S. 640, 647 (2000) (quoting Roberts v. United States Jaycees, 468 U.S. 609, 622 (1984)), and from denying an individual citizen "rights and privileges solely because of [his] association with an unpopular organization," Healy, 408 U.S. at 186.   "[G]uilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government, is an impermissible basis upon which to deny First Amendment rights." Id. (internal quotation marks omitted).

-35-

1.  <u>The State as Employer, and the</u> Pickering <u>Test</u>

When acting as an employer, "the State has interests . . . in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568 (1968).  More than "[o]ne hundred years ago, the [Supreme] Court noted the government's legitimate purpose in 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.'" <u>Connick v. Myers</u>, 461 U.S. 138, 150-51 (1983) (quoting <u>Ex parte Curtis</u>, 106 U.S. 371, 373 (1882)).

> "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.  This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.  Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

<u>Connick</u>, 461 U.S. at 151 (quoting <u>Arnett v. Kennedy</u>, 416 U.S. 134, 168 (1974) (concurring opinion of Powell, <u>J</u>.)).

> When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.

<u>Waters v. Churchill</u>, 511 U.S. 661, 675 (1994) (plurality opinion).

In sum, "the government as employer indeed has far broader powers than does the government as sovereign." <u>Id</u>. at 671.

> The key to First Amendment analysis of government employment decisions . . . is th[at t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts

as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

Id. at 675.

This does not mean that public employees, merely by accepting public employment, "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the [government's] operation," Pickering, 391 U.S. at 568, for "the First Amendment's primary aim is the full protection of speech upon issues of public concern, as well as the practical realities involved in the administration of a government office," Connick, 461 U.S. at 154. Accordingly,

[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

Pickering, 391 U.S. at 568. See also Garcetti v. Ceballos, 126 S. Ct. 1951 (2006) (statements made by a public employee pursuant to his official duties, rather than as a citizen, are not protected by the First Amendment).

The Pickering test thus poses two questions (the first being "implicit in Pickering," City of San Diego v. Roe, 543 U.S. 77, 82 (2004) ("Roe")): (1) whether the employee's speech as a citizen was on a matter of public concern, and if so, (2) whether the employer has shown that the employee's interest in expressing himself on that matter is outweighed by injury that the speech could cause to the employer's operations. See, e.g., Garcetti, 126 S. Ct.

-37-

at 1958; Waters, 511 U.S. at 668 (plurality opinion); Connick, 461 U.S. at 142; Pickering, 391 U.S. at 568.

The issue of whether the subject of an employee's speech or expressive conduct is a matter of public concern is a threshold question. See, e.g., Roe, 543 U.S. at 84. If the employee "fails th[is] threshold test[,] Pickering balancing does not come into play." Id.; see, e.g., Connick, 461 U.S. at 146 (if the employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge"). Thus, we ask first whether the employee's expressive conduct was speech as a citizen on a matter of public concern. "If the answer is yes, then the possibility of a First Amendment claim arises." Garcetti, 126 S. Ct. at 1958. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Id.

## 2. Public Concern

Because the meaning and application of constitutional provisions are issues of law that must be determined by the court, the question of whether an employee's expressive activity is speech on a matter of public concern is an issue of law for the court. See, e.g., Connick, 461 U.S. at 150 n.10. In considering a First Amendment claim of deprivation of the right to free speech, "we are compelled to examine for ourselves the statements in issue and the circumstances under which they [were] made to see whether or not they . . . are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth

-38-

Amendment, protect." Id. (internal quotation marks omitted); see, e.g., id. at 148 n.7 ("The inquiry into the protected status of speech is one of law, not fact."); Waters, 511 U.S. at 668 (plurality opinion) ("it is the court's task to apply the Connick test to the facts").

The question of what is a matter of public concern is not amenable to a simple, definitive answer. Nonetheless,

> Connick provides some guidance. It directs courts to examine the "content, form, and context of a given statement, as revealed by the whole record" in assessing whether an employee's speech addresses a matter of public concern. [461 U.S.] at 146-147. In addition, it notes that the standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present. Id., at 143, n. 5. That standard is established by our decisions in Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975), and Time, Inc. v. Hill, 385 U.S. 374, 387-388 (1967). These cases make clear that public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.

Roe, 543 U.S. at 83-84 (emphasis added); see also Connick, 461 U.S. at 146 (speech on a matter of public concern is speech "relating to any matter of political, social, or other concern to the community").

3. Employer Justification for Restricting Employee Speech

If it is determined that the employee's expressive conduct as a citizen involved a matter of public concern, the government bears the burden of justifying its adverse employment action. See, e.g., United States v. National Treasury Employees Union, 513 U.S. 454, 466 (1995) ("NTEU"). Justifications may include such

considerations as maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute. See, e.g., Waters, 511 U.S. at 675 (plurality opinion).

Evidence that such harms or disruptions have in fact occurred is not necessary. The employer need only make a reasonable determination that the employee's speech creates the potential for such harms. "[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships [are] manifest before taking action." Connick, 461 U.S. at 152.

Further, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." Id. at 151-52; see, e.g., Waters, 511 U.S. at 673 (plurality opinion) ("government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern" are "given substantial weight"); id. ("we have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions [by the government as sovereign] on the speech of the public at large"). Such deference to the government's assessment of potential harms to its operations is appropriate when the employer has conducted an objectively reasonable inquiry into the facts--an inquiry that need not be constrained by the rules of evidence, such as the rule against hearsay, applicable in judicial proceedings--and has arrived at a good faith conclusion as to those facts. See id. at 676-77

(plurality opinion).  If the employer meets this test, it may, as a matter of law, impose the discipline it deems reasonable, based on the facts it has found, without incurring liability.  See, e.g., id. (plurality opinion); see also id. at 685 (concurring opinion of Souter, J.) ("A majority of the Court agrees that employers whose conduct survives the plurality's reasonableness test cannot be held constitutionally liable (assuming the absence of pretext) . . . .").

The employer does not meet its burden, however, if there is no demonstrated nexus between the employee's speech and the employer's operations.  Where there is no such nexus, the state's interest as an employer is not implicated, and restrictions on the employee's speech will be subjected to the same scrutiny given to restrictions imposed on citizens' speech by the state as sovereign.  See, e.g., NTEU, 513 U.S. at 465-66, 467 n.11, 470.

In NTEU, the Supreme Court considered a federal statute that prohibited lower-level federal government employees from accepting any compensation for making speeches or writing articles.  The plaintiffs were federal employees who, in their off-duty hours, spoke or wrote on topics that usually bore no relationship to their employment.  While their speech was evidently on topics of public concern--they were offered compensation by public groups and entities for their talks and writings--the NTEU Court noted that, "[w]ith few exceptions, the content of [plaintiffs'] messages has nothing to do with their jobs and does not even arguably have any adverse impact on the efficiency of the offices in which they work."  Id. at 465 (emphasis added); see id. ("Neither the character of the authors, the subject matter of their expression, the effect of the

-41-

content of their expression on their official duties, nor the kind of audiences they address has any relevance to their employment." (emphasis added)). Regulations implementing the statute "exclude[d] a wide variety of performances and writings that would normally appear to have no nexus with an employee's job." Id. at 476. With "no nexus to Government employment," the Court stated, "no corrupt bargain or even appearance of impropriety appears likely." Id. at 474.

The government's only argument in defense of the statute's wholesale ban on the employees' acceptance of honoraria for their off-duty speech was that the outright ban would be easier to administer than a nexus-related prohibition that would require a case-by-case comparison of the speech or article with the employee's job. Although the Court had normally "'given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large,'" id. at 475 n.21 (quoting Waters, 511 U.S. at 673 (plurality opinion)), the NTEU Court concluded that "[d]eferring to the Government's speculation about the pernicious effects of thousands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections," NTEU, 513 U.S. at 476 n.21.

Accordingly, the Court held that the "blanket burden on the speech of nearly 1.7 million federal employees," speaking or writing on their own time on topics unrelated to their employment, "requires a much stronger justification than the Government's dubious claim of administrative convenience." Id. at 474.

The NTEU principle does not immunize an employee's expressive activities--even those that take place during his off-duty hours and outside of the workplace, and that purport to be "about subjects not related to his employment"--when his employer's "legitimate and substantial interests" are "compromised by his speech." Roe, 543 U.S. at 81. The plaintiff in Roe, an officer of the San Diego Police Department ("SDPD"), spent off-duty hours displaying and selling on the internet videos that showed him stripping off what was obviously a police uniform and masturbating. The uniform Roe wore was not the specific uniform worn by San Diego policemen, but he offered official San Diego police uniforms for sale, along with other items such as underwear, police equipment, and custom-made videos. His presentations did not include any commentary on the workings or functioning of the San Diego police department. When the SDPD ordered Roe to cease selling sexually explicit videos or engaging in any similar conduct on the internet, by mail, or through any other means of distribution to the public, Roe only partially complied, continuing to purvey his first two videos and offering to make custom videos. See Roe, 543 U.S. at 78-79. After internal proceedings, Roe was discharged. He sued the city, alleging that the termination violated his First Amendment rights. The district court dismissed his claim on the ground that his expressive conduct was not on a matter of public concern. The court of appeals, citing NTEU, reversed, stating that Roe's conduct was on a matter of public concern, had taken place while he was off duty and away from his employer's premises, and was unrelated to his employment.

The Supreme Court reversed. The Court had "no difficulty in concluding that Roe's expression does not qualify as a matter of public concern under any view of the public concern test." Roe, 543 U.S. at 84. It also found NTEU entirely inapplicable because "[i]n NTEU it was established that the speech was unrelated to the employment and had no effect on the mission and purpose of the employer," id. at 80. Roe's conduct, in contrast, brought the police department into serious disrepute:

> Although Roe's activities took place outside the workplace and purported to be about subjects not related to his employment, the SDPD demonstrated legitimate and substantial interests of its own that were compromised by his speech. Far from confining his activities to speech unrelated to his employment, Roe took deliberate steps to link his videos and other wares to his police work, all in a way injurious to his employer. The use of the uniform, the law enforcement reference in the Web site, the listing of the speaker [in his advertising] as "in the field of law enforcement," and the debased parody of an officer performing indecent acts while in the course of official duties brought the mission of the employer and the professionalism of its officers into serious disrepute.

Id. at 81. Although the court of appeals stated that SDPD had conceded that Roe's activities were "'unrelated'" to his employment, the Supreme Court reasoned that

> the proper interpretation of the City's statement is simply to underscore the obvious proposition that Roe's speech was not a comment on the workings or functioning of the SDPD. It is quite a different question whether the speech was detrimental to the SDPD. On that score the City's consistent position has been that the speech is contrary to its regulations and harmful to the proper functioning of the police force. The present case falls outside the protection afforded in NTEU.

Id. at 81-82; see id. at 84 ("The speech in question was detrimental to the mission and functions of the employer."). In sum, to have a

-44-

nexus to his employment, an employee's speech need not comment on the workings or functioning of the employer's operation; it is sufficient that that speech be detrimental to that operation.

B.  The Record in the Present Case

    1.  Application of the Public Concern Test

With these principles in mind, we begin by addressing plaintiffs' contention that Connick's public concern test is inapplicable to claims asserting violation of the right to expressive association and their concession in the district court that their expressive conduct was not on a matter of public concern. We conclude that both their concession--at least so far as Piscottano, Kight, and Vincenzo are concerned--and their contention are erroneous.

We note first our agreement with the district court that, in order to prevail on a First Amendment freedom-of-expressive-association claim, a government employee must show, inter alia, that his expressive association involved a matter of public concern--just as would a government employee complaining of a violation of his right to freedom of speech. See, e.g., Cobb v. Pozzi, 363 F.3d 89, 102-07 (2d Cir. 2004). Given that freedom of speech is expressly protected by the First Amendment and that freedom of expressive association is not, the latter being deemed protected only as derivative of freedom of speech, we see no logic in plaintiffs' contention that they should be allowed to establish a violation of the derivative right on less proof than is required for establishment of a violation of the expressly protected right from

-45-

which it is derived. See, e.g., id. at 105-07.

Second, as discussed above, the inquiry into whether the speech at issue is on a matter of public concern is a question of law for the court. Thus, concessions by the parties are not necessarily dispositive, and our review of the record persuades us that the concession by plaintiffs in this case is only partially correct.

An individual's association with an organization can be deemed to involve expression on a matter of public concern in either of two ways. First, the organization itself may engage in advocacy on a matter of public concern. If it does, the individual's association with the organization may constitute, at least vicariously, expressive conduct on a matter of public concern. See generally Roberts, 468 U.S. at 622; Melzer v. Board of Education, 336 F.3d 185, 195-96 (2d Cir. 2003), cert. denied, 540 U.S. 1183 (2004). Second, even where the organization itself does not purport to engage in advocacy on matters of public concern, the individual's association with the organization may--although it does not necessarily--constitute approval or an endorsement of the nature and character of the organization. Such approval or endorsement itself would constitute expressive conduct on a matter of public concern if the nature or character of the organization is a matter of public concern.

In the present case, plaintiffs have conceded that the Outlaws is not an organization that speaks out on matters of public concern, and the record as a whole supports that concession. There was no evidence to the contrary; and Kight, for example, testified

-46-

that what the Outlaws is "all about" is riding motorcycles, having parties, and "hav[ing] fun." (Tr. 103; see also id. at 137 (Scappini: Outlaws functions are "social"); id. at 6 (Piscottano: Outlaws is essentially "a social club").) Thus, we accept plaintiffs' concession to the extent that it meant that they are not engaged in expressive conduct on matters of public concern vicariously by reason of advocacy by the OMC itself.

This does not, however, answer the question of whether plaintiffs' own conduct in associating with that chapter constitutes expressive conduct on a matter of public concern, given the history and character of the national organization with which the Connecticut chapter is affiliated and of other Outlaws chapters. The NDIC reports numerous instances in which members of the Outlaws in various parts of the country have engaged in violent criminal activity, including rape, arson, bombings, and murder, and numerous convictions and imprisonments of Outlaws members. (See Part I.A.1. above.) Plainly, the nature of the organization with which the Connecticut chapter is affiliated is a matter of public concern.

The conduct of three of these plaintiffs can easily be seen as expressing their view--approval--of the Outlaws local chapter, the national organization with which it is affiliated, and other Outlaws chapters. DOC presented evidence that Piscottano and Kight--even after resigning their membership--not only attended several Outlaws events but also wore Outlaws colors. Vincenzo, even though he has denied ever being a member, has likewise admitted wearing Outlaws apparel. State Police Trooper Williams, an expert in motorcycle gangs, testified that Outlaws colors are a source of

-47-

pride (see Tr. 188); and Kight, when asked the significance of wearing Outlaws colors, similarly testified that "[i]t's a proud thing" (id. at 103).

Further, the criminal activity in other Outlaws chapters is material here because, while plaintiffs repeatedly emphasize that no member of the Connecticut chapter (qua Outlaw) has thus far been accused or convicted of a crime, the Connecticut chapter's affiliation with the national organization--and the resulting close relationship with other Outlaws chapters--is one of the stated attractions of associating with the Outlaws. Three of the plaintiffs, when asked to describe the reasons for their involvement in the Outlaws, responded, under oath, that one of their reasons was that "as a Club member, I can travel anywhere in the world and be welcomed as a brother." (E.g., Piscottano Answer to DOC Interrogatory No. 8 (emphasis added); Kight Answer to DOC Interrogatory No. 8 (same); Vincenzo Answer to DOC Interrogatory No. 8 (same).) (We note that Vincenzo gave this answer despite having denied that he ever was a member of the Outlaws.) Kight, for example, apparently received such a welcome in Florida. When asked about occasions on which, despite his resignation, he was "permitted to wear colors at club functions," he stated:

> Well, I was just down in Daytona last month or maybe four to six weeks ago, whatever, and I was down there at a party down there and they brought the colors down to me and I wore them while I was down in Daytona.

(Tr. 104.) Thus, Piscottano, Kight, and Vincenzo treasure their associations with members of other Outlaws chapters that may well be conducting criminal enterprises. Their wearing of Outlaws colors

-48-

and apparel plainly expressed their approval of the Outlaws and its affiliated organizations.

The inference that their endorsement extends to other chapters of the Outlaws is supported both by their interrogatory answers described above, embracing association with Outlaws chapters "anywhere in the world," and by their Complaint and in-court testimony. In their Complaint, plaintiffs have taken the position, contrary to the NDIC report, that other chapters have not engaged in criminal activity. They alleged that

> [t]he DOC Report contains information purportedly gathered from an October 2002 "National Drug Intelligence Center" publication and from an anonymous source which is entirely false and without basis in fact . . . .

(Complaint ¶ 18 (emphasis added).) And Piscottano, at the preliminary injunction hearing, testified as follows:

> Q. Th[e DOC 2003 Report] contains a whole section which has at the beginning, the following information was gathered from The National Drug Intelligence Center publication dated October, 2002.
>
> Have you had a chance to review that?
>
> A. Yes.
>
> Q. Is that information accurate?
>
> A. No.

(Tr. 14-15 (emphases added).) Thus, in denying that other Outlaws chapters have engaged in criminal activity, plaintiffs have aligned themselves with the Outlaws and against local, State, and national law enforcement agencies. (See also Transcript of December 22, 2003 SD Interview of Piscottano, at 12, in which Piscottano expressed outrage that a State Police Homeland Security/SWAT team would serve a search warrant during the Outlaws Christmas party.)

-49-

In sum, on this record, we think it plain that Piscottano, Kight, and Vincenzo, by, inter alia, repeatedly consorting with the Outlaws and wearing Outlaws colors and apparel in public--even at such times as they were not members of the Outlaws--engaged in expressive activity approving of the nature of the Connecticut chapter of the Outlaws, of the national Outlaws organization, and of other Outlaws chapters.

The fact that law enforcement agencies believe the Outlaws and many of its chapters engage in criminal activity is sufficient in itself to make the nature of those entities a matter of public concern. In addition, in this case we note that public concern was reflected in two other ways. First, the investigation into plaintiffs' activities was sparked by a letter to the Commissioner from a member of the public, expressing apprehension at the prospect of violent encounters between the Outlaws and the Hells Angels, complaining that the motorcycle clubs were terrorizing ordinary citizens, and protesting that patch-wearing members of the Outlaws were State-employed correctional officers. Second, these officers' association with the Outlaws was the subject of a freedom-of-information inquiry from the press. We conclude that the expressive conduct of Piscottano, Kight, and Vincenzo, demonstrating pride in and approval of the organization thus criticized by others, constituted speech by these three plaintiffs on a subject that is a matter of public concern.

While we conclude that the nature and character of the Outlaws is a topic of public concern, we have not seen any evidence in the record that Scappini engaged in expressive conduct on that

topic. The record gives no indication that he ever wore Outlaws colors. His response to interrogatories, unlike those of the other three plaintiffs, did not treasure the worldwide welcomes by members of other Outlaws chapters. And SD found no evidence that he attended any Outlaws events after he received the DOC 2003 Report that detailed criminal activity by other Outlaws members around the United States. We conclude that the record does not support an expressive association claim by Scappini because, if he engaged in any expressive conduct, it was not shown to be on a matter of public concern. His expressive association claim was properly dismissed on that basis.

With respect to Piscottano, Kight, and Vincenzo, our conclusions (a) that the nature and activities of the Outlaws national organization and its affiliated chapters are a matter of public concern, and (b) that these three plaintiffs engaged in expressive conduct approving of the Outlaws and its chapters, mean that our analysis of their First Amendment claims must proceed to the balancing phase of the Pickering test. That said, we have no difficulty in concluding that the record shows that the balance is in favor of DOC.

2. DOC's Evidence as to Likely Disruption of Its Operations

Although plaintiffs contend that any balancing favors them because their association with the Outlaws is unrelated to their employment, occurring away from the workplace in their off-duty hours, we reject their contention that there is no nexus between that association and DOC's operations. The evidence sufficiently

-51-

shows that DOC conducted reasonable investigations (see Part I.A., I.B., and I.C. above) and arrived at a good-faith conclusion that having correctional officers who are associated with the Outlaws is detrimental to DOC operations and reflects negatively on DOC.

Although DOC presented no evidence that actual disruptions had yet occurred, the record as a whole, including the testimony of its top-ranking officials, who are experts in prison administration and/or the problems of gang violence, amply described threats to safety, potentials for disruption, potential conflicts of interest, and interference with the integrity of DOC's operations.

For example, gang fights in which correctional officers are involved--such as the altercation in which, according to the Chaser's Café employee, Piscottano and Kight, wearing Outlaws colors, were involved and Kight was hit in the face by a member of the Crossroads Motorcycle Club--reflect negatively on the Department. Such fights also frequently imperil innocent bystanders. At the Chaser's Café altercation, for example, gunshots were fired.

Further, DOC's concerns for the safety of its staff in the prison setting are plainly implicated whenever, for example, there is violent interaction among inmates (see, e.g., Part I.C.5. above, describing DOC's experiences with respect to the gang-related bludgeoning of one inmate and fire-bombing of another), or an inmate attack on a prison guard (see id., describing Hells Angels leader's statement to State Police officer that correctional officers who were associated with the Outlaws were thereby "in jeopardy"). DOC has a legitimate interest in reducing such risks, without having to

wait for emergencies.

Plaintiffs' associations with the Outlaws also had the potential to interfere with DOC's collaboration with other law enforcement agencies. For example, Lantz testified that DOC staff members participate in task forces focusing on gang activity. The allegiance of any DOC employees to the Outlaws could jeopardize those working relationships by raising questions as to whether employees of DOC could be relied on to, inter alia, maintain confidentiality as to planned surveillances and executions of search warrants.

Moreover, DOC has an interest in avoiding even the appearance that its correctional officers have conflicts of interest. For example, as a general matter, any correctional officer who wished to become a member of the Outlaws would have an incentive to give favorable treatment to an inmate who was already an Outlaws member, for the Outlaws bylaws require that for a chapter to elect a new member, the membership's vote must be unanimous. As for Kight in particular, after he resigned his Outlaws membership, members of the Outlaws repeatedly did him the favor, in disregard of their bylaws, of bringing him Outlaws colors to wear. Kight testified that the Outlaws "allowed me to wear them because they have a lot of respect for me and they know that I still love the club . . . ." (Tr. 103.) Any acceptance of favors raises the prospect that the favors will be returned, creating the appearance of a potential conflict of interest. And Kight's acceptance of these favors out of his "love [for] the club" plainly gave him a potential conflict of interest if there were an inmate who happened

to be a member of the Outlaws.

Further, because of rivalry between the Outlaws and the Hells Angels, a correctional officer who is associated with the Outlaws might be tempted to deny fair treatment to an inmate who was a member of the Hells Angels. Even in the absence of such unfairness, the very fact that the officer was associated with the Outlaws could give an inmate who was a member of the Hells Angels (or of any other rival club) a plausible claim that he was denied fair treatment by the officer or, in a disciplinary hearing against the inmate, a basis for challenging the testimony by the Outlaws-associated officer for bias.

Nor is the thought that an Outlaws-affiliated correctional officer might mistreat an inmate member of a rival gang at all fanciful. According to Piscottano, the Outlaws itself instructed him not to abuse Outlaws rivals:

> When I was a member of the Outlaws Motorcycle Club ("Club"), I was expressly instructed that under no circumstances should I take action of any kind, or retaliate in any way, against any member of any other motorcycle club, should I happen to encounter one in the course of my work as a correctional officer. According to the Club, everyone is neutral in the prison setting, everyone gets along and there is no competition or rivalry of any kind.

(Affidavit of Gary Piscottano dated February 7, 2005, ¶ 9.) Even leaving aside the contraindicated suggestion that there are no frictions between rival gang members in prison, DOC need not rely on the proposition that its correctional officers will perform their jobs properly because they have been so instructed by the Outlaws.

We conclude that DOC established that the conduct of Piscottano, Kight, and Vincenzo, expressing their approval of the

-54-

nature and character of the Outlaws, had the potential in several ways to disrupt and reflect negatively on DOC's operations, and that DOC's interest in maintaining the efficiency, security, and integrity of its operations outweighed the associational interests of those plaintiffs. Accordingly, plaintiffs' freedom-of-expressive-association claims were properly dismissed.

## III. FREEDOM OF INTIMATE ASSOCIATION

Plaintiffs contend that the district court erred in dismissing their intimate association claims on the ground that the Outlaws is not a selective organization, and that the court erred in failing to consider that plaintiffs have close personal friendships with Outlaws members. We disagree.

Although "[t]he source of the intimate association right has not been authoritatively determined," Adler v. Pataki, 185 F.3d 35, 42 (2d Cir. 1999); see id. at 42-44 (discussing cases that frame the right as either an implied First Amendment right or as a fundamental liberty protected by the Due Process Clause of the Fourteenth Amendment), the relationships that have been recognized as entitled to protection under either Amendment are "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship," Roberts, 468 U.S. at 620; see also id. (among the factors to be considered are "size, purpose, policies, selectivity, [and] congeniality"). Relationships that "exemplify" constitutionally

protected intimate associations "are those that attend the creation and sustenance of a family," such as "marriage," "childbirth," "the raising and education of children," and "cohabitation with one's relatives." Id. at 619; see, e.g., Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d 435, 438 (3d Cir. 2000) ("intimate association" means "certain close and intimate human relationships like family relationships").

Entities such as "large business enterprise[s]," on the other hand, are "remote from the concerns giving rise to this constitutional protection." Roberts, 468 U.S. at 620. When presented with the issue, the Supreme Court has consistently held that large social clubs are not constitutionally protected "intimate" associations. See, e.g., Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537, 546 (1987) ("Duarte") (local clubs, ranging in size from fewer than 20 to 900 members, did not implicate the right of intimate association); Roberts, 468 U.S. at 621 (same with respect to local clubs having more than 400 members); see also Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d at 438, 442 (same with respect to college fraternity ranging from 22 to 80 members).

In the present case, the district court ruled that plaintiffs' affiliation with the Outlaws was not a constitutionally protected intimate association because there was no evidence that the OMC is either a small group or a particularly selective group with respect to its membership or attendance at its functions:

> Although neither party has specified the precise size of the Outlaws, it is apparent that it is not a small group. . . . The Outlaws is an international organization with chapters in the

-56-

United States, Canada, Europe and Australia. . . . Within the United States, there are chapters located in many states, including Wisconsin, Florida, Indiana, North Carolina, Massachusetts, New Hampshire, New York and Connecticut. . . . Indeed, according to Plaintiff Gary Piscottano, "when an [Outlaws] member dies, hundreds of members attend the funeral and offer support and comfort to the family."

Piscottano II, 2005 WL 1424394, at *7 (quoting Piscottano Answer to DOC Interrogatory No. 8) (emphasis in Piscottano II). The court continued:

Nor is the Outlaws a particularly selective organization. To be sure, membership in the Outlaws is not open to the general public. Membership is extended only by invitation and involves a probationary period. . . . Nevertheless, nothing in the record reveals any onerous requirements for membership. According to Plaintiffs, the group "embraces" those who chose a "non-mainstream, non-traditional, unconventional lifestyle, appearance, ideals and/or job." . . . .

It is also undisputed that many of the Outlaws' activities and events--such as motorcycle rides, cookouts and parties--are freely open to non-members. . . . This lack of seclusion from the public also militates against a finding that the Outlaws is the type of intimate association that justifies First Amendment protection. See Roberts, 468 U.S. at 621 (finding significant that "numerous non-members . . . regularly participate in a substantial portion" of the Jaycees activities); Duarte, 481 U.S. at [547] (noting that "[m]any of the Rotary Clubs' central activities are carried on in the presence of strangers") . . . .

Piscottano II, 2005 WL 1424394, at *7 (quoting Plaintiffs' Rule 56(a)(1) Statement, submitted in support of their cross-motion for summary judgment, ¶¶ 32-33).

The district court's description was taken from statements of the plaintiffs themselves in their answers to interrogatories, in their responses to defendants' Rule 56(a)(1) Statement of Undisputed Facts, and in plaintiffs' own statement of the facts that plaintiffs

-57-

contended were undisputed. We have been pointed to no evidence in the record that shows the existence of any material disputed fact on these issues, and we see no error in the district court's application of the above principles.

Nor do we see any error in the court's rejection of plaintiffs' contention that they were disciplined for merely associating with friends who happened to be members of the Outlaws. The notices of termination and counseling bespoke no such rationale; nor did the testimony or documentary evidence. For example, at the preliminary injunction hearing, Murphy was asked whether Vincenzo, who at that time had simply been counseled, would be subject to discipline under Directive 2.17 for riding his motorcycle with, e.g., Piscottano, who frequently consorted with the Outlaws and had been discharged. Murphy distinguished between a correctional officer's mere association with a friend who happened to be affiliated with the Outlaws and an officer's apparent association with the Outlaws organization itself:

> If they're riding with the Outlaws with all patch members, that may be an issue. If he's friends with Mr. Piscottano in an independent capacity, I can't stop that. But once it crosses the line where it appears to be attached to the Outlaws as an organization, a criminal enterprise, it will probably be looked at.

(Tr. 270-71 (emphases added).)

In sum, the evidence in the record does not support plaintiffs' contention that DOC imposed discipline on the basis of their close personal friendships. We affirm the dismissal of plaintiffs' intimate association claim substantially for the reasons stated by the district court.

Finally, plaintiffs contend that the imposition of discipline on them pursuant to Directive 2.17 violated their rights to due process, arguing that that regulation, in prohibiting a correctional officer from engaging in behavior that "could . . . reflect negatively on the Department of Correction," is impermissibly vague.  Given that the due process doctrine of vagueness is designed to ensure that, before risking a deprivation of liberty or property, a person have fair notice of the type of conduct that is prohibited, we conclude that plaintiffs' due process claims were properly dismissed.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  Thus, a law or regulation whose violation could lead to such a deprivation must be crafted with sufficient clarity to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them."  Id.

"Condemned to the use of words," however, "we can never expect mathematical certainty from our language."  Id. at 110.  Thus, a regulation need not achieve "meticulous specificity," which would come at the cost of "flexibility and reasonable breadth," id.

-59-

(internal quotation marks omitted); and regulations "are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language," United States v. National Dairy Products Corp., 372 U.S. 29, 32 (1963). Rather, the question of whether a statute or regulation is unconstitutionally vague is determined by whether it afforded fair notice to the plaintiff to whom it was applied. "In determining the sufficiency of the notice," a regulation "must of necessity be examined in the light of the conduct with which a defendant is charged." Id. at 33. "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) ("Hoffman"); see, e.g., Parker v. Levy, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness.").

Further, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Hoffman, 455 U.S. at 498-99. And it has indicated that generalized language may appropriately be used to set out standards of conduct for employees. See, e.g., Arnett v. Kennedy, 416 U.S. 134, 159 (1974) (plurality opinion). Accordingly, prohibitions phrased in general terms have been upheld when they were plainly applicable to the conduct of the employee plaintiff, despite the existence of questions as to whether they would give fair notice with respect to other, hypothetical, conduct at the periphery. See,

-60-

e.g., Janusaitis v. Middlebury Volunteer Fire Department, 607 F.2d 17, 27-28 (2d Cir. 1979) (regulation barring "unbecoming conduct detrimental to the welfare or good name of [a Fire] Department" was not impermissibly vague as applied to a fireman who had been warned that if he continued to publish defamatory allegations about the department, he would be fired for violating the regulation); diLeo v. Greenfield, 541 F.2d 949, 953 (2d Cir. 1976) (provision allowing termination of a teacher's employment for "other due and sufficient cause" was not vague as applied to a teacher charged with exhibiting improper conduct toward students); Allen v. City of Greensboro, North Carolina, 452 F.2d 489, 491 (4th Cir. 1971) (regulation barring conduct "unbecoming an officer and a gentleman" was not vague as applied to a policeman accused of making improper advances toward a woman in connection with an official investigation).

In Arnett, the Supreme Court considered a vagueness challenge to a provision of the Lloyd-La Follette Act that authorized a federal agency to remove or suspend without pay a nonprobationary federal employee "for such cause as will promote the efficiency of the service," 5 U.S.C. § 7501(a) ("[a]n individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service") (repealed by the Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 204(a), 92 Stat. 1111, 1134). A majority of the Court found the provision not impermissibly vague. See Arnett, 416 U.S. at 158-61 (plurality opinion); id. at 164 (opinion of Powell, J. (agreeing with the reasoning of the plurality opinion on this issue)); id. at 177 (opinion of White, J. (same)). The Arnett Court noted:

> [T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. [If t]he general class of offense to which . . . [the provisions are] directed is plainly within [their] terms . . . , [they] will not be struck down as vague, even though marginal cases could be put where doubts might arise.

Arnett, 416 U.S. at 159 (plurality opinion) (internal quotation marks omitted).

> Congress sought to lay down an admittedly general standard, not for the purpose of defining criminal conduct, but in order to give myriad different federal employees performing widely disparate tasks a common standard of job protection. We do not believe that Congress was confined to the choice of enacting a detailed code of employee conduct, or else granting no job protection at all.

Id.

Although the Arnett Court noted that "[t]he phrase 'such cause as will promote the efficiency of the service' as a standard of employee job protection is without doubt intended to authorize dismissal for speech as well as other conduct," id. at 160 (plurality opinion), the Court observed that Pickering makes clear that "'the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general,'" and that those interests may allow "the discharge of [the] employee . . . based on his speech without offending guarantees of the First Amendment." Arnett, 416 U.S. at 160-61 (plurality opinion) (quoting Pickering, 391 U.S. at 568). Citing the "essential fairness of this broad and general removal

-62-

standard, and the impracticability of greater specificity," the Arnett Court concluded that

> [b]ecause of the infinite variety of factual situations in which public statements by Government employees might reasonably justify dismissal for "cause," we conclude that the Act describes, as explicitly as is required, the employee conduct which is ground for removal.

416 U.S. at 161 (plurality opinion).

A.   Directive 2.17 and the Notice Given to All Plaintiffs

Directive 2.17 sets out Standards of Conduct outlining conduct that is mandatory and conduct that is prohibited. Insofar as plaintiffs challenge it for vagueness, Directive 2.17 provides that employees are prohibited from "[e]ngag[ing] in unprofessional . . . behavior, both on and off duty, that could in any manner reflect negatively on the Department of Correction."

In September 2003, all of the plaintiffs were interviewed by SD with respect to their membership, affiliation, or association with the Outlaws. Two of them admitted to having been members in the past; all of them stated that they attended Outlaws events even as nonmembers. All of them were questioned about criminal activity by Outlaws members. They all denied knowledge of any such activity. (See DOC 2003 Report at 7 (Vincenzo: "I have no knowledge of any illegal activity by the Outlaws Motorcycle club."); id. (Piscottano: "I do not know that the Outlaws are involved in any criminal activity, if they were I wouldn't be there."); id. at 10 (Kight: "I am not aware of any illegal activity by any of the members of the club, unless drinking a few beers is considered an illegal activity. There may be criminal activity in other states but none in

-63-

Connecticut as far as I know."); id. at 11 (Scappini: "I am not aware of or seen [sic] any illegal activity by any member of the Outlaws Motorcycle Club.").) Plainly, after being questioned by SD about criminal activity by Outlaws members, any reasonable person would be aware that such activity was a matter of concern to DOC.

The DOC 2003 Report, described in Part I.B.2. above, prepared after the SD interviews of plaintiffs, began by stating that

> [o]n August 1, 2003, Commissioner Theresa C. Lantz forwarded a referral to the Director of Security for an official investigation into the allegations that several Correction Officers are members or associates of the Outlaws Motorcycle Club.

(DOC 2003 Report at 1.) As described in Parts I.A.1., I.A.2., and I.B.2. above, the DOC 2003 Report proceeded to detail information DOC had received from federal, State, and local law enforcement agencies as to widespread criminal activities by the OMC, which had led to scores of prosecutions and convictions. (See id. at 1-6.) These Outlaws activities included trafficking in ecstasy, marijuana, and cocaine; selling stolen goods; exploiting female associates as prostitutes; and engaging in racketeering through the use of violent crimes such as arson, bombings, and murder.

The DOC Report described law enforcement agency surveillances of the Connecticut chapter of the Outlaws during which each of the plaintiffs had been observed attending Outlaws events. (See id. at 2.) It described SD's interviews with each plaintiff on the subject of his involvement with the Outlaws, and recorded the statements of Piscottano and Kight that although they had for a time been members of the Outlaws they had resigned in early or mid-2003.

-64-

(See id. at 6, 10.)  And it described observations of Kight wearing Outlaws colors subsequent to his resignation.  (See id. at 15.)

The DOC Report's Summary stated, inter alia, that all of the plaintiffs had "positively been identified as being involved or associating with the Outlaws Motorcycle Club."  (Id. at 14.)  The DOC Report concluded that each of the plaintiffs had violated various provisions of Directive 2.17, including its prohibition against "[e]ngag[ing] in unprofessional or illegal behavior, both on and off duty, that could in any manner reflect negatively on the Department."  (Id. at 16-18.)

Each plaintiff was furnished with a copy of the DOC Report.  And each was notified that he would be given a Loudermill hearing and an opportunity to, inter alia, dispute the allegations of the DOC Report.  (See, e.g., Complaint ¶ 20 ("On or about November 20, 2003 Plaintiffs were provided with a copy of the DOC Report and were ordered to report to DOC for pre-disciplinary hearings.  At those hearings, Plaintiffs were warned that as a result of the violations outlined in the DOC Report, they could be subject to discipline, up to and including termination.").)

Accordingly, although plaintiffs profess to have had no idea that any Outlaws members in any OMC chapters had engaged in any criminal activity, the record shows beyond cavil that plaintiffs were on notice at least as early as November 20, 2003, (a) that law enforcement agencies had copious information that Outlaws chapters across the nation were engaging in criminal activity, and (b) that DOC considered that the affiliation of its correctional officers with the Outlaws would pose a potential conflict of interest and

reflect negatively on the Department, in violation of Directive 2.17. And although plaintiffs contend that the phrase "could in any manner reflect negatively on the Department" did not provide them with reasonable notice that their activities with the Outlaws in their free time were prohibited, that contention defies common sense. That provision of Directive 2.17 expressly refers to activities on or "off duty"; and it is not beyond the intelligence of an ordinary person, much less that of a correctional officer, to recognize that a criminal-justice-system officer's association with an organization whose affiliates engage in criminal activity reflects negatively on the agency that employs him. As the DOC officials stated at the preliminary injunction hearing, it would be difficult to fashion a directive that anticipated the entire range of human behavior and specified every instance of prohibited conduct (see Tr. 276); but surely conduct that could reflect negatively on a criminal justice agency "inherent[ly]" encompasses "association with . . . known criminal enterprises" (Tr. 363).

Finally, although plaintiffs argue that they had no personal knowledge of any ongoing criminal activity by members of the Connecticut chapter of the Outlaws or members of other Outlaws chapters, and have taken the position that the NDIC Report of criminal activity on the part of the Outlaws in other parts of the United States is "entirely false and without basis in fact" (Complaint ¶ 18), those arguments provide no support for their claim that Directive 2.17 is impermissibly vague. It is undisputed that DOC had received reports from several law enforcement agencies that the Outlaws national organization and affiliated chapters were

-66-

engaged in criminal activity (see, e.g., Plaintiffs' Responding Rule 56(a)(2) Statement ¶ 17 (admitting that the NDIC Report (see Part I.A.1. above) "set forth" "allegations" that, inter alia, members of the Outlaws had engaged in and been prosecuted for, convicted of, and imprisoned on account of various crimes including racketeering, robberies, bombings, and murder)).  It is indisputable that DOC credited those reports.  (See, e.g., Plaintiffs' Summary Judgment Memorandum at 48 ("Defendants' concerns about Club affiliation were based upon their view that the Club was a criminal enterprise.").)  And in November 2003 plaintiffs were apprised in writing of those reports and DOC's concern.  (See, e.g., Complaint ¶ 20.)

In sum, each plaintiff had been questioned in September 2003 as to his knowledge of any criminal activity by Outlaws members, questioning that sufficed to alert him that DOC was concerned that there might be such activity and concerned about employing correctional officers who were members or associates of the Outlaws.  And each plaintiff had explicit notice at least as early as November 2003 that DOC considered the Connecticut chapter of the Outlaws to be affiliated with an organization that engaged in criminal activity and considered that a correctional officer's affiliation with the Outlaws would reflect negatively on the Department.

B.  Application of Directive 2.17 to the Individual Plaintiffs

Despite the DOC concerns that were imparted to plaintiffs in the fall of 2003, three of the plaintiffs engaged in conduct thereafter that plainly fell within the scope of Directive 2.17's

prohibition against conduct that could reflect negatively on the Department.

### 1. The Continued Conduct of Kight

Following his September 2003 interview, Kight continued his public relationship with the Outlaws, wearing Outlaws colors. In October 2003, he was involved in an altercation at Chaser's Café. He was knocked unconscious, and gunshots were fired. An employee at that café identified Kight and several others, all wearing Outlaws colors, and stated that Kight had been struck in the face by a member of a rival gang. Kight was hospitalized with a broken jaw and broken nose. Although he maintained that he had suffered those injuries by falling in his bathtub, the State Police report stated that his injuries were inconsistent with such a fall but consistent with his having been struck in an altercation. The involvement of a DOC correctional officer, wearing Outlaws colors, in a public altercation at which shots were fired surely could reflect negatively on the Department.

Kight was repeatedly allowed by the Outlaws to wear Outlaws colors despite having resigned his membership. He explained that Outlaws members brought him the colors out of their "respect" for him and because of their knowledge that he "still love[d] the club." (Tr. 103.) Regardless of whether members of any other Outlaws chapters were involved in criminal activity, the granting of such favors to Kight created the possibility that he might grant favors in return within the prison setting; this plainly exposed DOC to potential criticism. Such favors could take the form not only of

-68-

giving preferential treatment to an inmate who was a member of the Outlaws, but also of giving unduly harsh treatment to an inmate who was a member of a rival gang. And if a member of a rival gang accused Kight of abuse, even an unfounded accusation would place DOC in the unfavorable position of having to defend without the ability to deny Kight's conflict of interest. Similarly, if there were a prison disciplinary hearing against such an inmate and Kight were called to testify, his credibility would be subject to attack for his pro-Outlaws bias against the rival gang. Thus, Kight's repeated acceptance of favors from the Outlaws compromised his credibility and potentially threatened the integrity of prison disciplinary proceedings. Plainly such possibilities, especially once DOC had learned of Kight's close association with the Outlaws, would reflect negatively on DOC.

In November 2003, Kight was served with the DOC 2003 Report that concluded that his continued participation in Outlaws events and wearing of Outlaws colors violated Directive 2.17's prohibition against conduct that could reflect negatively on DOC. Even had Kight not been on notice since September 2003 that DOC viewed such conduct as violating Directive 2.17, the DOC Report indisputably gave him such notice, as well as notice of the various law enforcement agencies' information as to widespread criminal activity on the part of the Outlaws national organization and affiliated chapters.

Finally, Kight's Loudermill hearing was held on December 4, 2003, and he was "warned" at that hearing "that as a result of the violations outlined in the DOC Report, []he[] could be subject

-69-

to discipline, up to and including termination" (Complaint ¶ 20). Nonetheless, Kight proceeded to attend the Outlaws Christmas party on December 20, 2003, wearing Outlaws colors. His wearing of Outlaws colors showed that he was "proud" of the organization. (Tr. 103.) It surely requires no special intelligence to realize that Kight's repeated displays of his pride in being associated with a group believed by every level of law enforcement to be affiliated with an organization engaged in widespread criminal activity could reflect negatively on the Department.

In sum, the undisputed facts of record make it clear that Kight received fair notice that the Outlaws-related activities in which he engaged after September 2003 would violate Directive 2.17's prohibition against conduct that could reflect negatively on DOC. Kight's vagueness claim was properly dismissed.

2. The Continued Conduct of Piscottano

Piscottano too continued his open association with the Outlaws in the fall and winter of 2003. He sought, however, to overturn his discharge in part by asserting that he knew of no criminal activity on the part of the Outlaws and claiming that in fact the NDIC report of such criminal activities was not accurate (see Tr. 14-15), and in part by stating that he had received advice indirectly from a DOC warden, Larry Myers, and a supervisor, Michael Lajoie, that a correctional officer's association with the Outlaws would not violate DOC policies so long as the officer himself was not involved in criminal activity. Piscottano's contentions provide no basis for reversal, given the concerns communicated to him by DOC

-70-

during and after his September 2003 interview.

In some circumstances, advice from officials as to the propriety of proposed conduct may indeed justify an individual in believing that his planned conduct is not prohibited. In Cox v. Louisiana, 379 U.S. 559 (1965), for example, the Supreme Court overturned a conviction for violation of a statute that prohibited protests "near" a courthouse, because police officers had advised the appellant that his planned demonstration across the street from the courthouse would not violate that prohibition, and the protestors proceeded to hold their demonstration at the expressly approved location. See id. at 571 ("after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could" would be inconsistent with due process). As discussed below, the advice received by Piscottano, in contrast to that received by the appellant in Cox, was not received directly from officials, was not contemporaneous with the conduct that led to his dismissal, and had become clearly obsolete--at best--as a result of DOC's direct dealings with Piscottano prior to the conduct that led to his dismissal.

Piscottano's evidence that he had received advice that his association with the Outlaws would not violate DOC regulations, so long as he himself did not engage in criminal activity, consisted principally of the affidavit of Sabettini, which stated, in relevant part, as follows:

> Some time in 2001, I spoke to Warden Meyers [sic], then Warden of NCI [the correctional institution to which Sabettini was assigned], concerning my association with the Club. Later in the year I spoke to Major Lajoie about my association with the Club. Both Meyers [sic] and Lajoie informed me that

-71-

this association would not pose a problem, as long as I was not involved in any criminal activities. I relayed this information to Gary Piscottano.

(Affidavit of Randy Sabettini dated April 23, 2004, ¶ 6.) The statement by Sabettini that he had inquired of his supervisors "concerning [his] association with the Club" is silent as to precisely what information he conveyed to them in seeking their advice. Nor does Sabettini in his affidavit identify the time period when he relayed information to Piscottano. (Piscottano himself could only say that he had received the information from Sabettini prior to September 2003.) However, any information relayed from the "2001" conversations to which Sabettini referred must have concerned his association with an Outlaws chapter other than the Connecticut chapter, for the Connecticut chapter of the Outlaws was not founded until 2002.

SD, having been informed early in its investigations that Sabettini had at some point made some inquiry of his supervisors with respect to his association with the Outlaws, interviewed Myers and Lajoie. Neither Myers nor Lajoie provided any information with respect to any conversation with Sabettini in 2001; but both indicated that they had had conversations with him in mid- or late 2002. Myers stated:

I can't recall if [Sabettini] specifically mentioned the Outlaws, but I recall telling him that if [he] was not involved in any criminal activities I didn't see an issue with him riding motorcycles with club members. I can't recall Officer Sabettini specifically saying that he was a member of any motorcycle club.

(Interview Statement of retired Warden Larry Myers dated January 8, 2004.) Lajoie described a conversation in which Sabettini

-72-

asked whether or not it was an issue if he was a member of the Outlaws. I told him that I didn't know of any directives that specifically addressed being involved with a club of that nature and as long as he was not committing any crimes or doing anything wrong, I didn't believe it violated any departmental policies. I told him that it didn't look very good in the eyes of perception when an officer was believed to be a member of any motorcycle group of this nature. At some point he stated that he was no longer a member and I told him that he was better off not associating with anyone from that organization. I would occasionally have conversations with Officer Sabettini in passing where he would state that he was still out of the organization. Officer Sabettini never informed me of how long he was in the organization or if he held any position within the club. Officer Sabettini never spoke of specifics concerning the club with me.

(Interview Statement of Major Michael Lajoie dated December 17, 2003.)

Piscottano's reliance on the Sabettini affidavit thus leaves a number of questions unanswered. It is not clear, for example, whether the information Sabettini "relayed" to Piscottano was simply that membership in the Outlaws posed no problem--information that may have been either premature (if relayed in 2001) or outdated (if relayed after the warnings given by Lajoie in 2002)--or whether the relayed information instead included Lajoie's response that "it didn't look very good in the eyes of perception when an officer was believed to be a member of any motorcycle group" such as the Outlaws, advice that could not reasonably be viewed as countenancing such activities.

What is clear is that Piscottano stated he received the Sabettini-relayed advice prior to September 2003, and that that advice could not reasonably be viewed as providing Piscottano any solace thereafter. In September 2003, DOC's interview of Piscottano

-73-

with respect to his Outlaws-related activities was plainly sufficient to alert him that DOC had a negative view of correctional officers' engaging in such activities. In November 2003, Piscottano received the DOC 2003 Report, which detailed law enforcement agencies' information as to widespread criminal activity on the part of the Outlaws national organization and affiliated chapters. That Report also expressly concluded that Piscottano's continued participation in Outlaws events and wearing of Outlaws colors violated Directive 2.17's prohibition against conduct that could reflect negatively on DOC. Finally, at his Loudermill hearing, which was held on November 21, 2003, Piscottano was "warned that as a result of the violations outlined in the DOC Report, []he[] could be subject to discipline, up to and including termination" (Complaint ¶ 20). Given these DOC proceedings beginning in September 2003, no prudent correctional officer could reasonably rely on the information received in 2001 or 2002 to support a belief that Directive 2.17 would not be violated by his continued close association with the Outlaws.

Yet, after his DOC interview in September 2003, Piscottano was identified as one of those who, wearing Outlaws colors, was involved in the October 2003 public altercation with members of another motorcycle club at Chaser's Café, during which Kight was injured and gunshots were fired (see Parts I.C.1. and I.C.2. above). And after receiving the DOC 2003 Report and being warned at his Loudermill hearing in November 2003 that his continued association with the Outlaws could result in his dismissal, Piscottano proceeded to attend the Outlaws Christmas party, wearing Outlaws colors, in

-74-

December 2003. No rational factfinder could find that Piscottano lacked notice after September 2003 that such conduct could reflect negatively on DOC, in violation of Directive 2.17. The summary dismissal of his vagueness claim was appropriate.

### 3. The July 2004 Conduct of Vincenzo

Unlike Kight and Piscottano, who were dismissed in April 2004 because of their conduct in the fall and winter of 2003, Vincenzo was not dismissed until late 2004. In connection with his first Loudermill hearing in late 2003, Vincenzo stated that he had not attended any Outlaws event since September 2003, and SD saw no evidence to contradict that representation. Hence, in April 2004, DOC merely ordered that he receive counseling.

Vincenzo was dismissed in November 2004, however, following a further Loudermill hearing. The basis for his dismissal was that, after an inquiry to Lantz as to whether Vincenzo's attendance at the July 11, 2004 Outlaws event at the AmVets hall would violate any DOC regulation, and after Vincenzo received a response from Lantz that his attendance at that event would violate Directive 2.17, Vincenzo concededly went to the AmVets hall prior to the scheduled conclusion of the event. He remained there and drank with members of the Outlaws until the end of the event. He departed with members of the Outlaws after the event ended, having donned an Outlaws Support shirt. (See Part I.C.6. above.)

Vincenzo's contention that his conduct did not constitute "attend[ance]" at the July 11 event is frivolous, and it is incontrovertible that he received fair notice that his conduct would

-75-

violate Directive 2.17.  His vagueness claim was properly dismissed.

    4.    The Vagueness Claim of Scappini

Finally, we find no error in the dismissal of the vagueness challenge by Scappini, but for a different reason. Scappini, unlike the other plaintiffs, apparently did not participate in any Outlaws-related activities after being interviewed by SD in September 2003 or after receiving the DOC Report describing the criminal activities of the OMC.  Indeed, the SD 2004 Report on Scappini stated that SD had no information that Scappini had attended any Outlaws event after May 24, 2003. Accordingly, the record does not reveal any Outlaws-related conduct by Scappini after he learned of DOC's concern that such activities would violate Directive 2.17's prohibition against conduct that could reflect negatively on DOC.

However, unlike the other plaintiffs, Scappini was not dismissed.  He was placed on administrative leave during the pendency of his Loudermill hearing; but that was a fully-paid leave. He was issued a formal counseling letter; but that letter merely advised him that he would be disciplined if he again engaged in the conduct for which he was criticized in the DOC 2003 Report. Scappini suffered no loss of employment, no demotion, no loss of salary, no loss of benefits.  In short, Scappini adduced no evidence that the application of Directive 2.17 to him deprived him of any property.  His due process challenge to Directive 2.17 was properly dismissed.

-76-

We have considered all of plaintiffs' arguments on this appeal and have found them to be without merit.  The judgment dismissing the Complaint is affirmed.